## HENRY T. BULKLEY, CLAIMANT OF THE BARQUE EDWIN, APPELLANT, *v.* THE NAUMKEAG STEAM COTTON COMPANY.

At Mobile, it is necessary for a vessel drawing much water to lie outside of the bar and have her cargo brought to her by lighters.

The usage is for the lighterman to be engaged and paid by the captain of the vessel, to give his receipt to the factor for the cotton, and to take a receipt from the captain when he delivers it on board of the vessel.

Where a lighterman, thus employed, was conveying bales of cotton to a vessel lying outside of the bar, but before they were put on board, an explosion of the boiler threw the bales into the water, by which the cotton was damaged; the vessel was held responsible for the loss upon being libelled in a court of admiralty, the master having included these bales in the bills of lading which he signed.

The delivery of the cotton to the lighterman was a delivery to the master, and the transportation by the lighter to the vessel the commencement of the voyage, in execution of the contract by which the master had engaged to carry the cotton to Boston. When delivered by the shipper and accepted by the master at the place of shipment, the rights and obligations of both parties became fixed.

The cases in this court and in England examined.

THIS was an appeal from the Circuit Court of the United States sitting in admiralty for the district of Massachusetts.

The facts of the case are stated in the opinion of the court.

It was submitted on printed arguments by *Mr. Loring* for the appellant, and *Mr. Andros* for the appellee.

The principal question involved was thus stated by *Mr. Loring* in the opening of his argument:

One of the questions presented, the only one decided in the courts below, is whether or not a vessel may be liable, in a suit *in rem*, for the loss of or damage done to merchandise never received on board.

It was held that the mere reception of goods by the master or owners, for the purpose of being carried in a particular vessel, did create a liability on the part of *the vessel* for any subsequent loss or damage, though the goods were never placed on

board, and the loss was not caused by the insufficiency of the vessel, or any fault of its owners, master, or crew.

The claimant, conceiving that this decision is contrary to the principles of the maritime law and without precedent, and that the question is of importance, presents it for the consideration of this tribunal, and respectfully asks its attention to the suggestions to be presented in his behalf.

It is impossible for the reporter to do full justice to the arguments of the counsel on both sides, because they included so many branches of inquiry, with references to authorities. All that he can do is to give merely the points raised on both sides.

*Mr. Loring's* points were the following:

1. The libellants cannot hold either the vessel or the owners under the bills of lading, because the goods in question were not on board; and having insisted upon the master's signing such bills, are prevented thereby from resorting to the original contract of shipment.

2. The owners of the vessel were not common carriers.

3. The vessel is not liable *in rem.*

So far it has not been considered whether or not the libellants have a lien or privilege upon the vessel for the loss they have suffered.

The inquiry has been as to the personal liability of the owners. If the court shall be of opinion that the owners are not liable on the bill of lading, because the goods were not on board; or on the original parol contract, because that was superseded by the written contract in the bill of lading, which the libellants elected to take; or, if bound by such contract, that the owners were private and not common carriers, and there is no proof of want of ordinary care—then it is unnecessary to inquire as to the liability of the vessel, it being well settled, that except in cases of bottomry and salvage, there can be no claim against the thing unless there is a personal liability on the part of its owners.

In the case of the Druid, 1 W. Rob., 399, Dr. Lushington says: "No suit could ever be maintained against a ship where the owners were not themselves personally liable, or where the

personal liability had not been given up, as in bottomry bonds." And the rule as stated by him, to this extent, is expressly recognised and affirmed by this court in the 'case of the Freeman, 18 Howard, 189.

If on any ground the court should be of opinion that the owners could not be held personally liable for the loss suffered by the libellants, it necessarily follows that the vessel is not liable, and that this suit cannot be maintained. It is absolutely essential that such personal liability must exist in order to create a charge *in rem.*

If, however, the court should be satisfied that a personal liability does exist on the part of the owners, it does not follow as of course that the vessel is liable.

The libellants must go further, and show that the policy of the maritime law secures their claim and gives it a preference over others, by creating a privilege against the vessel. The common law gives no such preference.

There is not even a presumption that the vessel is liable because the owners are. The liabilities depend upon different grounds, and are not at all reciprocal. In this court, of late years, the tendency has been very strong to limit maritime privileges, and to deny their existence in cases where they had before been recognised. In the case of the Yankee Blade, 19 Howard, 82, they are said to be *stricti juris,* and not to be encouraged. In Thomas *v.* Osborn, 19 Howard, 22, and Reed *v.* Pratt, 19 Howard, 359, the liens of material men are confined to cases of necessity. A recent rule of the court prohibits the enforcement of domestic liens by the District Courts. The privilege of the ship-owner upon goods for freight is apt to be treated as a mere common-law lien, depending upon possession; and in People's Ferry Co. *v.* Beers, 20 How., 401,) it is said that "liens on vessels encumber commerce, and are discouraged."

As in all of these cases there would exist a personal liability on the part of the owners, it is very plain that that does not necessarily establish a privilege against the ship.

*Mr. Andros's* propositions were the following:

1. That between the libellant and the master of the vessel

against which a lien is sought to be enforced in the present case there was a valid contract of affreightment, which is binding upon the claimant and owners thereof.

2. That the owners of said vessel are liable as common carriers, and that such liability commenced immediately the master received the libellant's merchandise for transportation.

3. That the owners being liable in damages for the non-delivery of the libellant's merchandise, which had been by his agents delivered to and received by the master of the said vessel for transportation, the ship in specie is also liable, and that this liability arises from the contract of affreightment, which has been executed on the part of the libellant.

4. That the reception and lading of the libellant's merchandise on board of the lighter by the master of the vessel, for the purpose of transporting it to the same, was a sufficient performance of the libellant's part of the contract of affreightment to enable him to hold the ship in specie as security for the due performance of the master's part of the agreement.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States, sitting in admiralty, for the district of Massachusetts.

The libel in the court below was against the barque Edwin, to recover damages for the non-delivery of a portion of a shipment of cotton from the port of Mobile to Boston. The facts upon which the question in this case depends are found in the record as agreed upon by the proctors, both in the District and Circuit Courts, and upon which both courts decreed for the libellant.

From this agreed state of facts, it appears that the master of the vessel, which was then lying at the port of Mobile, agreed to carry for the libellant 707 bales of cotton from that port to Boston, for certain freight mentioned in the bills of lading.

The condition of the bay of Mobile, which is somewhat peculiar, becomes material to a proper understanding of the question in this case.

Vessels of a large size, and drawing over a given depth of water, cannot pass the bar in the bay, which is situate a considerable distance below the city. Their cargo is brought to them in lighters, from the city over the bar, and then laden on board the vessels. Vessels which, from their light draft, can pass the bar in ballast, go up to the city and take on board as much of their cargoes as is practicable, and, at the same time, allow them to repass it on their return, and are then towed below the bar, and the residue of their load is brought down by lighters and put on board.

In either case, when the vessel is ready to receive cargo below the bar, the master gives notice of the fact to the consignor or broker, through whom the freight is engaged, and provides, at the expense of the ship, a lighter for the conveyance of the goods. The lighterman applies to the consignor or broker, and takes an order for the cargo to be delivered, receives it, and gives his own receipt for the same. On delivering the cargo on board the vessel below the bar, he takes a receipt from the mate or proper officer in charge.

The usual bills of lading are subsequently signed by the master and delivered.

In the present case, the barque Edwin received the principal part of her cargo at the city, and was then towed down below the bar to receive the residue. The master employed the steamer M. Streck for this purpose, and 100 bales were laden on board of her at the city to be taken down to complete her load, and for which the master of the lighter gave a receipt; after she had passed the bar and had arrived at the side of the barque, but before any part of the 100 bales was taken out, her boiler exploded, in consequence of which the 100 bales were thrown into the water and the lighter sunk. Fourteen of the bales were picked up by the crew of the vessel, and brought to Boston with the 607 bales on board. Eighty bales were also picked up by other persons, wet and damaged, and were surveyed and sold; four remain in the hands of the ship broker, at Mobile, for account of whom it may concern; two were lost.

The master of the barque signed bills of lading, including

the 100 bales, being advised that he was bound to do so, and that if he refused, his vessel would be arrested and detained. On her arrival at Boston, the master delivered the 607 bales to the consignees, and tendered the fourteen, which were refused.

A question has been made on the argument, whether or not the libellant could recover upon the undertaking in the bills of lading, they having been signed under the circumstances stated, or must resort to the original contract of affreightment between the master and the shipper. The articles in the libel place the right to damages upon both grounds. The view the court has taken of the case supersedes the necessity of noticing this distinction.

The court is of opinion that the vessel was bound for the safe shipment of the whole of the 707 bales of cotton, the quantity contracted to be carried, from the time of their delivery by the shipper at the city of Mobile, and acceptance by the master, and that the delivery of the hundred bales to the lighterman was a delivery to the master, and the transportation by the lighter to the vessel the commencement of the voyage in execution of the contract, the same, in judgment of law, as if the hundred bales had been placed on board of the vessel at the city, instead of the lighter. The lighter was simply a substitute for the barque for this portion of the service. The contract of affreightment of the cotton was a contract for its transportation from the city of Mobile to Boston, covering a voyage between these termini, and when delivered by the shipper, and accepted by the master at the place of shipment, the rights and obligations of both parties became fixed—the one entitled to all the privileges secured to the owner of cargo for its safe transportation and delivery; the other, the right to his freight on the completion of the voyage, as recognised by principles and usages of the maritime law.

The true meaning of the contract before us cannot be mistaken, and is in perfect harmony with the acts of the master in furtherance of its execution.

Both parties understood that the cotton was to be delivered to the carrier for shipment at the wharf in the city, and to be transported thence to the port of discharge. After the deliv-

ery and acceptance at the place of shipment, the shipper had no longer any control over the property, except as subject to the stipulated freight.

The contract as thus explained being made by the master in the course of the usual employment of the vessel, and in respect to which he is the general agent of the owner, it would seem to follow, upon the settled principles of admiralty law, which binds the vessel to the cargo, and the cargo to the vessel, for the performance of the undertaking, that the ship in the present case is liable for the loss of the hundred bales, the same as any other portion of the cargo.

It is insisted, however, that the vessel is exempt from responsibility upon the ground that the one hundred bales were never laden on board of her, and we are referred to several cases in this court and in England in support of the position. (18 How., 189; 19 Ib., 90; and 2 Eng. L. and Eq. R., 337; Grant and others *v.* Norway and others. 18 Eng. C. L. and Eq., 561; 29 Ib., 323.) But it will be seen, on reference to these cases, the doctrine was applied, or asserted, upon a state of facts wholly different from those in the present case. In the cases where the point was ruled, the goods were not only not laden on board the vessel, but they never had been delivered to the master. There was no contract of affreightment binding between the parties, as there had been no fulfilment on the part of the shipper, namely, the delivery of the cargo.

It was conceded no suit could have been maintained upon the original contract, either against the owner or the vessel; but as the bill of lading had been signed by the master, in which he admitted that the goods were on board, the question presented was, whether or not the admission was not conclusive against the owner and the vessel, the bill of lading having passed into the hands of a *bona fide* holder for value.

The court, on looking into the nature and character of the authority of the master, and the limitations annexed to it by the usages and principles of law, and the general practice of shipmasters, held, that the master not only had no general authority to sign the bill of lading, and admit the goods on board when contrary to the fact, but that a third party taking the

bill was chargeable with notice of the limitation, and took it subject to any infirmity in the contract growing out of it.

The first time the question arose in England, and was determined, was in the case of Grant and others *v.* Norway and others, in the Common Pleas, (1851,) and was in reference to the state of facts existing in this and like cases, and in connection with the principles involved in its determination, that the court say the master had no authority to sign the bill of lading, unless the goods had been shipped; cases in which there had been no delivery of the goods to the master, no contract binding upon the owner or the ship, no freight to be carried, and, in truth, where the whole transaction rested upon similated bills of lading, signed by the master in fraud of his owners.

In the present case the cargo was delivered in pursuance of the contract, the goods in the custody of the master, and subject to his lien for freight, as effectually as if they had been upon the deck of the ship, the contract confessedly binding both the owner and the shipper; and, unless it be held that the latter is entitled to his lien upon the vessel also, he is deprived of one of the privileges of the contract, when, at the same time, the owner is in the full enjoyment of all those belonging to his side of it.

The argument urged against this lien of the shipper seems to go the length of maintaining, that in order to uphold it there must be a physical connection between the cargo and the vessel, and that the form of expression in the cases referred to is not to be taken in the connection and with reference to the facts of the particular case, but in a general sense, and as applicable to every case involving the liability of the ship for the safe transportation and delivery of the cargo. But this is obviously too narrow and limited a view of the liability of the vessel. There is no necessary physical connection between the cargo and the ship, as a foundation upon which to rest this liability. The unlading of the vessel at the port of discharge, upon the wharf, or even the deposit of the goods in the warehouse, does not discharge the lien, unless the delivery is to the consignee of the cargo, within the meaning of the bill of la-

ding; and we do not see why the lien may not attach, when the cargo is delivered to the master for shipment before it reaches the hold of the vessel, as consistently and with as much reason as the continuance of it after separation from the vessel, and placed upon the wharf, or within the warehouse. In both instances the cargo is in the custody of the master, and in the act of conveyance in the execution of the contract of affreightment. We must look to the substance and good sense of the transaction; to the contract, as understood and intended by the parties, and as explained by its terms, and the attending circumstances out of which it arose, and to the grounds and reasons of the rules of law upon the application of which their duties and obligations are to be ascertained, in order to determine the scope and extent of them; and, in this view, we think no well-founded distinction can be made, as to the liability of the owner and vessel, between the case of the delivery of the goods into the hands of the master at the wharf, for transportation on board of a particular ship, in pursuance of the contract of affreightment, and the case as made, after the lading of the goods upon the deck of the vessel; the one a constructive, the other an actual possession; the former, the same as if the goods had been carried to the vessel by her boats, instead of the vessel going herself to the wharf.

The decree of the court below affirmed.