## PEARCE v. THE THOMAS NEWTON.

*(District Court, D. North Carolina.  November 20, 1889.)*

1. MARITIME LIENS—DAMAGES TO CARGO.
   The lien upon a vessel for the safe custody and due transport of goods to be shipped in her attaches at the time of the delivery of such goods to her agents and owners.

2. SHIPPING—DAMAGE TO CARGO—EXTRAORDINARY PERILS.
   Where such owners have provided a place for the stowage of the goods, safe from all but extraordinary events, they are not liable for damages directly resulting from a tidal wave and flood, such as had occurred but twice before in 40 years.

3. SAME—NEGLIGENCE.
   But they are liable for the damage that results from their failure to dry such goods, even where they could not do so, if they have refused to deliver the goods to the owner, who asked for them, and thus afford him an opportunity to dry them himself.

In Admiralty.  Libel for damages.

*Starke & Martin*, for libelant.

*Sharp & Hughes*, for claimant.

SEYMOUR, J.  The libelant was consignee of four cases of goods, which were received for shipment in Philadelphia by the Clyde Line on March 31st and April 1st last, and bills of lading were given therefor.  They were to be delivered to him at South Mills, N. C.  The Clyde Line runs no further than to Norfolk, Va.; and there, as appears by the bills of lading, they were to be delivered to the steamer Thomas Newton.  The Thomas Newton is a steamer running between Norfolk, through the Dismal Swamp canal, to South Mills and other places in North Carolina, and leaving Norfolk twice a week, viz., on Mondays and Thursdays, at 6 A. M.  She is the property of the Norfolk & Dismal Swamp Steam-Boat Company.  The merchandise was delivered to this company at about 11 o'clock on Thursday morning, too late for the trip of the Newton for that day, and was therefore stored by the company's agent to await the next trip of the boat, which should have been on Monday morning. While so stored a violent storm and flood of water occurred, which flooded, not only the steam-boat company's warehouse, but the entire water front of Norfolk.  It was, as appeared from the evidence, a flood such as had occurred but twice during the previous 40 years.  The steam-boat company suffered in common with all others who had wharves on the river, —among them the Old Dominion Steam-Ship Company, whose agent, Mr. Turner, testified to similar injuries to merchandise awaiting transportation at their warehouse.  The steam-boat company had rooms on upper floors of the same building in which these goods were stored, which were not affected by the water; but the rise of the flood was so sudden and unexpected that it would have been impossible—occurring, as it did, late at night—to have moved the goods to these upper stories.  The damage was done by the water on Saturday night and the following day, or resulted from the wetting then received by the merchandise.  As a result of the storm, the steamer Thomas Newton was unable to make her

regular trip on Monday, and only delivered the goods at South Mills on the following Friday. There was considerable testimony adduced with a view to show negligence in the company in not taking the goods to South Mills earlier than was done; but, in the view taken by the court of the case, that matter becomes immaterial. On Monday, as the court finds from the evidence, after the storm, and after his goods were wet, libelant went to the agents of the Thomas Newton, and asked if there were any goods there for him. He testifies that young Mr. Johnson, whom he saw, said he had not seen any; that there were none there. On Wednesday, being informed that they were still at Norfolk, libelant asked the agents of the boat for the goods, and was told that he could not see them or have them. Young Johnson says he would not give them to libelant unless he would give a receipt. On Thursday the goods were shipped, and on Friday, as has been said, delivered by the steam-boat Thomas Newton at South Mills. The damage done to the goods by the wetting was, as the court finds from the evidence, $528.35, and of this 30 per cent., or $157, was caused by the fact that they were not properly dried on Monday, but were, on the contrary, kept boxed up, in their wet condition, until Friday.

Three questions arise upon these facts: *First.* Was the damage one for which the vessel is liable *in rem? Second.* Were the owners liable for the damages by the storm of Saturday, the ———— of April? *Third.* If not, were they liable for the damage resulting from the fact that the goods were not dried on Monday?

1. It is contended that the injuries were received before the goods reached the vessel, and that therefore no action *in rem* lies. The proposition laid down in claimant's brief, and for which he cites many authorities, is admitted. It is:

"No lien on a vessel until a lawful contract of affreightment is made, and a cargo shipped under it."

The words are used in numerous cases of authority. The fallacy lies in an incorrect meaning attached to the word "shipped." The sentence is, in substance, to be found in the opinion of the supreme court in *The Freeman* v. *Buckingham,* 18 How. 182, 188, cited in claimant's brief, and is used with little variation of phrase in *Vanderwater* v. *Mills,* 19 How. 82, and *Pollard* v. *Vinton,* 105 U. S. 7–12. In all these cases the question was whether there was any contract of affreightment. In *The Freeman* v. *Buckingham* the master had given a bill of lading for goods never shipped, and an assignee had libeled the vessel. In *Vanderwater* v. *Mills* the owners of the libeled vessel had made a contract to carry freight from a certain port to another; but had never sent their vessel to the proposed port of shipment. In neither case had any goods been delivered to the master of the libeled vessel, or its agents. In *Pollard* v. *Vinton,* 105 U. S. 7–12, MILLER, J., says:

"Before the power to make and deliver a bill of lading could arise, some person must have shipped goods on the vessel. Only then could there be a shipper, and only then could there be goods shipped. In saying this, we do not mean that the goods must have been actually placed on the deck of the

vessel. If they come within the control and custody of the officers of the boat, for the purpose of shipment, the contract of carriage had commenced."

The case of *Bulkley* v. *Cotton Co.*, 24 How. 386, is one in which no lien could have been enforced, did the word "shipped" bear the interpretation contended for. The bark Edwin, lying below the port of Mobile, had contracted to carry 707 bales of cotton to Boston, and the injury to the goods, for which she was libeled, happened by the explosion of a boiler of a steam-boat employed to carry them from the wharf to the Edwin, and before they had reached the bark. NELSON, J., says, in delivering the opinion of the supreme court:

"The unloading of the vessel, at the port of discharge, upon the wharf, or even the deposit of the goods in the warehouse, does not discharge the lien; * * * and we do not see why the lien may not attach when the cargo is delivered to the master for shipment, before it reaches the hold of the vessel."

To the same effect is *The Oregon*, Deady, 179, affirmed in the circuit court on appeal by FIELD, J. That delivery of goods to a lighter, and receipt therefor by the master, is a good delivery, is held in *The Sunlight*, 2 Hughes, 9. There are two liens in a contract of affreightment,—the one, of the vessel on the freight; the other, of the freight on the vessel. The owner of the cargo has a lien upon the ship for the safe custody, due transport, and right delivery of the same, as much as the ship-owner has upon the cargo for freight. *The Maggie Hammond*, 9 Wall. 435. This lien begins upon the receipt of the goods for shipment. Upon such receipt the goods are "shipped." 1 Pars. Mar. Law, 132; Conk. Adm. 151. The court therefore holds that the responsibility of the Thomas Newton began on Thursday, when her agents and owners received the goods.

2. For the storm, and its consequences, the owners cannot be held liable. They had, as appears, provided a place of storage for the goods, safe against all but extraordinary events. An earthquake, a tidal wave, an unprecedented storm, a flood such as occurs but twice in a generation, are events that no one can be required to provide against. If it were otherwise the risks to carriers, or else their expenses in providing against contingencies, would be enormously increased. It is for that reason that they are protected against what law-writers call the "acts of God."

3. But no overpowering force prevented them from doing what was necessary for the preservation of the goods after they were injured. Admit that they had no means of drying them. The owner asked for them, and they should have given him an opportunity of doing what they could not, or did not, do themselves. For the damages resulting from the fact that the goods remained uncared for from Monday until Friday, which are assessed at $157, libelant is entitled to a judgment *in rem* against the steamer Thomas Newton.