## THE POKANOKET.

(District Court, E. D. Virginia. April 22, 1908.)

SHIPPING—LOSS OF FREIGHT—DELIVERY TO VESSEL—LIGHTERAGE.

> Where goods were delivered at a steamboat company's dock for shipment, and it was thereafter found necessary to transport the goods to the steamer on a lighter, and they were damaged by the partial sinking of the lighter before reaching the steamer, the steamer was liable for the loss.
>
> [Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 411.]

In Admiralty.

Benj. H. Marks and Thomas H. Willcox, for libelant.
Henry Bowden, for respondent.

WADDILL, District Judge. The libel in this case was filed by the Norfolk Virginia Peanut Company to recover from the steamer Pokanoket for 137 bags of peanuts valued at $1,295.70, a part of a shipment of 275 bags intrusted by the libelants to the owners of the Pokanoket for loading on said steamer, to be transported from the port of Petersburg to the port of Norfolk, Va. The facts are briefly these: The Petersburg, Newport News & Norfolk Steamboat Company were the owners and operators of the respondent steamer, the Pokanoket, engaged in the carriage of passengers and freight upon the waters of the Appomattox, the James, and the Elizabeth rivers, between Petersburg and Norfolk, and having duly solicited, through George B. Townsend, general freight and passenger agent of said company and of said steamer, for the freight in question, on the 5th day of September, 1906, the 275 bags of peanuts were delivered at the wharf of said company and of said steamer in Petersburg for shipment to Norfolk on the Pokanoket, and a bill of lading was issued therefor. On the evening of the delivery of the peanuts, the steamer Pokanoket could not reach the harbor of Petersburg by reason of a freshet which caused a sand bar to form some quarter of a mile below the city. Whereupon a lighter was engaged by the steamboat company to place the steamer's freight, including the 275 bags of peanuts, on the Pokanoket; and the general manager of the company and others of its employés were engaged in the navigation of the lighter, when it collided with an obstruction in the river, causing it to partially sink, damaging the peanuts, to recover for which this suit was instituted; the

peanuts being injured to such an extent that most of them were not placed on board the Pokanoket.

The defense interposed here is not that the damage was not sustained, but that technically, upon the facts stated, the Pokanoket is not liable in admiralty, because of the failure to actually place the peanuts in question upon the vessel. This question has been frequently considered by the courts, and seems well settled, especially so far as the courts of this circuit are concerned; that is, that this technical defense will not avail to permit the respondent to escape liability under circumstances such as exist here. This doctrine has been considered as settled since the case of Bulkley v. Cotton Co., 24 How. 386, 16 L. Ed. 599. An early case on the subject in this circuit was that of Campbell, Wiley & Co. v. Barque Sunlight, 2 Hughes, 1, Fed. Cas. No. 2,368, a decision by Judge Bryan of the District of South Carolina, subsequently affirmed by Chief Justice Waite on circuit. In that case Judge Bryan said:

"It is well-settled law that the reception of the goods by the master on board of the ship, or at a wharf or quay near the ship, for the purpose of carriage therein, or by any person authorized by the owner or master so to receive them, binds the ship to the safe carriage and delivery of the goods. See 1 Parsons on Shipping and Admiralty, p. 183, and authorities cited. There is no necessary physical connection between the cargo and the ship as a foundation upon which to rest this liability. No well-founded distinction can be made as to the liability of the owner and vessel between the case of the delivery of the goods into the hands of the master at the wharf for transportation on board of a particular ship in pursuance of the contract of affreightment, and the case as made after the loading of the goods upon the deck of the vessel; the one a constructive, the other an actual possession. We must look to the substance and good sense of the transaction, to the contract as understood and intended by the parties."

The case of Pearce v. The Thomas Newton (D. C.) 41 Fed. 106, a decision by Judge Seymour of the Eastern District of North Carolina, is to the same effect; and in the comparatively recent decision by Judge Morris of the Maryland District in Insurance Co. v. North German Lloyd Co. (D. C.) 106 Fed. 973, is a full discussion of the subject; the court saying:

"Since the case of Bulkley v. Cotton Co., 24 How. 384, 16 L. Ed. 599, it has been conceded under circumstances such as are presented in this case—that is to say, where the contract is to carry goods from one port to another, and they cannot be loaded immediately on the vessel which is preparing for the voyage, and lighters are sent by the vessel to bring the goods from the warehouse to the ship—that, for the purpose of that service, the lighter is the substitute of the ship, and that the goods are in fact, therefore, delivered into the custody and care of the ship and her owners from the time that they are placed on the lighter. And for the purposes of this case, I shall take it that the bill of lading which was intended to be the contract for the carriage was applicable to these goods, and determined the rights of the parties from the time that the corn was put upon the lighter."

The case of The City of Alexandria (C. C.) 28 Fed. 202, decided by Judge Wallace of the Circuit Court of New York, upon an appeal in admiralty, also contains a full and interesting discussion of this doctrine.

The defense that the provisions of the Harter act would relieve from responsibility is not made in this case, the respondent's counsel con-

ceding that the same could not be maintained; but on that question reference may be had to the case of Insurance Co. v. North German Lloyds (D. C.) 106 Fed. 973–975, and to Ralli v. N. Y. & T. S. S. Co., 151 Fed. 286, 287, 83 C. C. A. 290.

It being manifest that the lighter in this case was used as a substitute for the Pokanoket in the matter of the transportation of the freight in question from the wharf to the steamer, then made fast in the river from the causes aforesaid, the bill of lading which was intended to be the contract for the carriage of the lost goods applies as well to the goods while on the lighter as if actually placed upon the Pokanoket; and a decree may therefore be entered in favor of the libelants for the amount claimed, in the libel, with costs.

---

THE SUN.

(District Court, S. D. New York. April 20, 1908.)

SALVAGE—AMOUNT OF COMPENSATION—ASSISTING DISABLED STEAMSHIP TO PORT.

    The ocean steamship Sun, on a voyage from Philadelphia to an English port, laden with oil, broke her rudder stock under water, and was unable to make any effective repairs. After drifting about for 13 days, endeavoring to steer by the wind, she signaled for and obtained the assistance of the British steamer Norwood, a smaller vessel bound for France. The scheme adopted was for the Sun to proceed under her own steam with the Norwood towing behind to act in some measure as a rudder, and in this manner they proceeded to New York, the Norwood losing about six days' time. She was of the value of from $60,000 to $70,000, while the Sun, which had jettisoned about one-third of her cargo, was with the remainder worth upwards of $500,000. The Sun was a new and strong vessel, and while in peril it was not imminently extreme. *Held*, that the Norwood was not entitled to as large an award as though she had been under the risks and responsibility of towing, and that under all the circumstances, having been subjected to no perils, except those of ordinary navigation, she was entitled to a salvage award of $13,500 and in addition the extra expenses incurred.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 70, 71.
    Awards in federal courts, see notes to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit for salvage.

The American steamship Sun, built in 1907, about 400 feet long and 3,501 tons net register, left Philadelphia in February, 1908, bound for Avonmouth, Eng., with a cargo of 2,274,000 gallons of petroleum. On February 18th, at 7 p. m., the vessel's rudder stock broke completely in two. The fracture was something over two feet under water, and there was no ring or eye on the rudder nearer the water surface than about 16 feet. The rudder therefore hung, swinging from side to side by the action of the waves, useless for purposes of steering, and unusually difficult of control by temporary tiller or rope lashing. From the 18th to the 23d of February the crew of the Sun used every effort to secure and control the rudder, and in so doing expended with entire unsuccess a very large quantity of ropes, wires, and other gear. On the 23d the vessel, after having moved to the southward and eastward, had come back northward and westward to approximately the place at which she broke down, which was in the path of vessels bound from New York or Philadelphia to English Channel and North Sea ports. She was then for the first time spoken by a passing vessel (the German tanker Phœbus), and declined that vessel's proffered assistance. The Sun was new and staunch, and approximately one-third of her cargo had been jettisoned, partly for the pur-