## THE ARABIEN (two cases).

(District Court, S. D. California, N. D. December 9, 1925.)

Nos. 17130, 17186.

1. **Shipping** ⬅133.

No lien exists against vessel for loss of merchandise not delivered to it.

2. **Shipping** ⬅133—Delivery to vessel may be constructive, and reciprocal liens may attach before merchandise reaches vessel's hold.

Delivery of merchandise to vessel may be constructive, and reciprocal liens may attach when cargo is delivered to master before it reaches hold of vessel.

3. **Shipping** ⬅105—Freight, delivered on dock to forwarding company, agent of charterer, which issued bills of lading, held not actually delivered to vessel.

Where charterers of vessel advertised for freight, which was received and receipted for by forwarding company, employed by charterer and stored on dock, but never placed in vessel's hold, though bills of lading were issued by charterer, *held* there was no actual delivery to vessel.

4. **Shipping** ⬅105—Acts or representations of owner, inducing shippers to believe that charterer was agent for vessel, as effecting constructive delivery, held not shown.

Where shippers, in response to charterer's advertisements for freight, delivered merchandise to dock, where it was receipted for by forwarding company as agent of charterer, which also issued bills of lading in its own name, *held* there were no acts or representations by owner entitling shippers to believe that charterer was acting as agent for vessel, so as to effect constructive delivery to vessel.

5. **Shipping** ⬅105—Authority to accept delivery and bind vessel may be express or implied from apparent authority.

Authority to accept delivery for, and to bind, vessel, may be conferred by express grant or conduct and relations of parties having such apparent authority that shipper is misled to his prejudice.

6. **Shipping** ⬅105—Facts estopping denial of receipt of freight must have misled shippers justifiably relying thereon.

Facts estopping vessel or her owner from denying receipt of freight must be such as not only misled shippers, but such as were justifiably relied upon by shippers to their prejudice.

**7. Shipping ⟨⟩105—Where shipper surrenders freight to persons engaged in receiving it at dock, proof of custom may be sufficient to estop vessel's denial of proper delivery.**

Where shipper, justifiably relying on general custom, delivers freight on dock to persons there engaged in receiving cargo, proof of custom may be sufficient to estop vessel from denying that proper delivery was actually made, though fact of delivery to persons unrelated to vessel is not otherwise affected by prevailing customs.

**8. Shipping ⟨⟩106—Vessel's breaking ground without issuance of bills of lading held not ratification of charterer's bills of lading covering freight not on board (Comp. St. § 8032).**

Where goods delivered to charterer's agent at dock were never placed on vessel, vessel's breaking ground without issuance of bills of lading covering such freight was not, under Comp. St. § 8032, ratification of bills issued in charterer's name.

In Admiralty. Libels by Dill-Crossett, Inc., and another and by the China, Japan & South America Trading Company, Limited, against the steamship Arabien, her machinery, tackle, apparel, and other furniture; the Steamship Company Orient, Limited, claimant. Decrees for respondent.

Glensor, Clewe & Van Dine, of San Francisco, Cal., for libelants.

Farnham P. Griffiths and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for respondent and claimant.

KERRIGAN, District Judge. In each of these libels recovery is sought of the value of certain merchandise, which libelants claim was delivered to and accepted by the steamship Arabien at San Francisco, for transportation to Japanese ports. Only a right in rem has been asserted, and these proceedings therefore are to foreclose purported liens on the vessel. Respondents' answers deny the delivery and acceptance, and also deny any agreement for transportation.

It appears that on September 18, 1917, the Steamship Company Orient chartered the Arabien at a lump rental to the American Asiatic Company, Inc., of which one L. A. McBride was president and virtually sole owner, for one voyage from San Francisco to Yokohama and Kobe; the vessel to furnish officers, crew, and stevedores, her stowage to be under the captain's supervision, and "the captain to sign bills of lading as desired by charterers or their agents, without prejudice to this charter party." The charterer thereupon inserted advertisements in the Guide and the Daily Commercial News, in which it invited the shipping public to make reservations of space for trans-Pacific shipments, naming the Arabien and her intended ports of destination. Publication of these advertisements continued daily until the vessel sailed, and in consequence of them reservations of space in fact were made by shippers generally.

The charterer rented a dock, and employed the Occidental Forwarding Company to receive, receipt for, and handle all cargo there delivered. This forwarding company, through one Hyde, its foreman, and through clerks under his direction, actually received such merchandise, gave receipts (in the charterer's name or in the names of individual clerks) therefor, and stacked all of it in a covered warehouse on the dock. Hyde selected the cars which he desired to load, and also determined what cargo, whether from cars or from warehouse, should go on the vessel. Since the track of a belt line railroad lay between the outer warehouse wall and the side of the ship, he was able to and did load each species of cargo independently of the other.

Dock permits by general custom were necessary indicia of authority for any shipper wishing to deliver goods to the dock. Without them no one was permitted to deposit cargo there. In accordance with this custom, each of the libelants, having made a space reservation, received a permit from the charterer, delivered its goods on the dock, received a dock receipt from clerks appointed by the charterer, and, upon surrendering these receipts to it, received in exchange its so-called bills of lading. The latter instruments were signed in the charterer's name, and admitted *its* receipt of the goods, "to be forwarded on the steamer Arabien or other steamer or steamers."

The charterer at all times had control of all cargo to go on the vessel, and, even after goods were in the warehouse, or in cars waiting to be loaded, sufficient to fill the ship, issued additional permits for the reception of cars of steel, and had their contents loaded on board. Hyde at all times gave preference to merchandise which arrived on railway cars, and moved that which was stored in the warehouse, only during the intervals at which no cars were available. The merchandise of libelants, for which he had receipted in the name of the charterer, lay approximately 100 feet away from the vessel. Part of it he managed to load, consisting of iron pipe and boiler tubes. The remainder, together with an entire shipment of phenol (carbolic acid crystals), remained on the dock, and never was loaded; whence it was converted to the use of McBride.

None of the officers or representatives, either of the Arabien or of her owner, had anything to do with the issuing of dock permits, or with the delivery or receipt of goods, until presented, as the charter party required, at ship's tackle. None of them signed receipts, bills of lading, or other papers of any character, and none of these were issued by any one in the name of the ship, owner, or officers. No positive representations, either by act or by word, to the effect that the charterer or the Occidental Forwarding Company was acting as agent for the vessel, was made by any one. Nevertheless it is asserted that a delivery of all the libelants' shipments was made *to the vessel,* and that it is liable in rem for failure to carry them, and for their resulting loss.

[1-3] That no lien exists against a vessel for lost merchandise, unless there has been a delivery to it, requires only statement. The Saigon Maru, 43 S. Ct. 172, 260 U. S. 490, 67 L. Ed. 364. That in this case no such delivery actually was made appears so clearly from undisputed facts as not to admit of reasonable contradiction. A delivery, it is true, may be constructive, and reciprocal liens may attach "when the cargo is delivered to the master for shipment before it reaches the hold of the vessel." Bulkley v. Naumkeag Steam Cotton Co., 24 How. (65 U. S.) 386, 394 (16 L. Ed. 599). But, in all of the cases in which this rule has been applied, emphasis has been placed upon the fact that by such a delivery *control and custody* pass to the master. Pollard v. Vinton, 105 U. S. 7, 9, 26 L. Ed. 998; The Oregon, 18 Fed. Cas. No. 10,553; Bulkley v. Naumkeag Steam Cotton Co., supra; Campbell v. The Sunlight, 4 Fed. Cas. No. 2368; 1 Parsons on Shipping and Admiralty, 183. As was said by Mr. Justice McReynolds in The Saigon Maru, supra: "The contract of affreightment itself creates no lien, and * * * the obligation between ship and cargo * * * does not attach until the cargo is *on board or in the master's custody.*" It therefore cannot be maintained that an actual delivery was made in this case.

Libelants assert that their goods had come within the control of the Arabien's officers, because of the fact that various portions (except in the case of the phenol) actually had been taken from the warehouse, at such times, in such manner, and in such quantities as the vessel's stevedores saw fit. Their argument is that they had relinquished all control of the goods, and that nothing thereafter was done by any person, which prevented the officers of the Arabien from taking them on board. These considerations might have more weight, were it not for the fact that, from the time of delivery to the dock until that at which the vessel sailed, all unladen goods remained in the undisputed custody of agents of the charterer. It is one thing to show that merchandise stored on a wharf is, unless held to be within the custody of a vessel, in that of no one, and clearly another to show that the wharf has been rented to a stranger, who has complete charge and control over all its contents.

[4] While it is true that the stevedores were in the employ of the Arabien, it is admitted that they acted according to the directions of the charterer, and had no discretion but to load the goods which were indicated to them. Hyde's determination in this regard was final. There was, as respondents point out, nothing to prevent the charterer from collecting huge amounts of goods and stacking them in the warehouse, far in excess of the capacity of the ship, and there doing with them exactly as it pleased. Continued custody and control on the part of the ship's officers was a manifest impossibility, and this fact alone requires a holding that the only actual delivery made in the case was to the charterer. The real question before me, therefore, is whether or not, by acts or representation, made or permitted by the owner, libelants were induced to believe that the charterer was acting as agent for the vessel.

[5] Authority to accept delivery for and to bind a vessel may be conferred, not only by express grant, but also by conduct and relations of the parties which establish such an apparent authority that the shipper is misled to his prejudice. In such a case, the carrier is estopped to deny the agency of the person or persons to whom delivery is made. 36 Cyc. 208. Here the argument is made that the charterer was understood by libelants to be the agent of the Arabien, for the purpose of receiving cargo as well as for the issuance of bills of lading, that their understanding was due to and resulted from an apparent and ostensible authority, with which the owner clothed it or knowingly permitted to exist, and that, having, in reliance on such authority, parted with their goods, respondents will not be heard to deny the fact of its existence.

[6] The owner's local agent received the Guide and the Daily Commercial News. He knew in a general way that the charterer was making bookings of space on board the Arabien, as well as on other vessels. He knew that it was necessary for some person or persons to accept delivery of cargo at the dock,

and to issue receipts therefor. The master knew that it was the statutory duty of the vessel, her owner, master, or agent, to issue bills of lading. He also knew that bills of lading purported to have been issued. In other words, the vessel and her owner not only allowed the charterer to handle dock permits and dock receipts, and to issue bills of lading *(in the charterer's own name)*, but issued no bills of lading or receipts of any kind. These facts, however, are insufficient to estop respondents, unless they not only misled libelants, but were justifiably relied on by them to their prejudice, for both are essential elements of every estoppel.

[7] Much evidence has been introduced, for and against the proposition that in San Francisco, by custom, delivery to a dock, accepted and receipted for by persons there engaged in receiving cargo, amounts to delivery to a vessel moored there. It is unnecessary to go into the question whether or not the custom exists. Except to show that libelants justifiably relied on delivery to the charterer as delivery to the ship, it can serve no purpose here, for it is clear that no power or control over the goods passed to the master. The fact of delivery into the custody of persons unrelated to the vessel cannot be altered by such evidence, where such fact is clearly made out. If, however, justifiably relying on a general custom, a shipper surrenders his goods on the dock, evidence of the custom, if not inconsistent with other facts which were within his knowledge, may be sufficient to estop the vessel to set up the fact that proper delivery was not actually made. The question therefore becomes subsantially this, Was or was not reception of the merchandise here in suit, in view of all the facts, made by persons "authorized by the owner or master so to receive them, *or seeming to have this authority by action or assent of the owner or master?"* 1 Parsons on Shipping and Admiralty, 183; The Pokanoket (C. C. A. 4) 172 F. 321, 96 C. C. A. 322, 383, 24 L. R. A. (N. S.) 569; affirming (D. C.) 161 F. 383; The Oregon, supra. After a careful examination of the testimony, I have come to the conclusion that the answer must be in the negative.

Each of the dock receipts in evidence contains one of the following provisions: "All goods at shipper's or owner's risk while on wharf awaiting loading;" "received the above specified packages, same to be held at shipper's or owner's risk while on wharf awaiting loading." Although none of the original dock receipts have been produced, the inference is strong that they contained a similar provision. Booking of cargo was done by the charterer. I see nothing in this fact which would lead a reasonable shipper to believe that the vessel was being represented; on the contrary, it would seem to indicate that the charterer was acting for itself. Furthermore, this assumption is strengthened by the fact that, without exception, the dock permits were issued in the charterer's own name.

The handling of and receipting for cargo at the dock were attended to by agents of the charterer, who in all cases signed *its* name (or the names of clerks) to the receipts which were issued. The dock obviously was not the property of the owners of the vessel, and at the same time was piled high with a great deal more merchandise than the Arabien possibly could carry; "enough for two or three ships," as one witness testified.

The bills of lading were issued by the charterer, again in its own name, as "steamship agents." Each bill contains a space for signature by the master, under the words, "in witness whereof the master of said steamer has signed  *  *  *  bills of lading. *  *  * The Master: —————." In this space, however, the name of the charterer, with its address, was printed with a rubber stamp, and through or below it was written the name or initials of one of the charterer's representatives.

All of these facts were apparent to libelants. Taken either singly or collectively, I find in them no adequate ground for holding that they amounted to a representation on the part of any one that delivery was being accepted for the vessel. Libelants dealt with the charterer, and it was to the charterer that they intrusted their goods. The circumstances accompanying the latter transaction were not such as reasonably to lead them to believe that the charterer was not acting for itself. They were satisfied with the charterer's receipts, which admitted that the *charterer* had received the goods at the dock. They did not ask for receipts from the vessel, or even for receipts showing or tending to show that the goods were delivered to it. They relied, for all that the evidence shows, entirely on the charterer, even to the extent of accepting its bills of lading, unsigned by the master. Respondents therefore are not estopped to set up the fact that no delivery ever was made to the vessel.

[8] Libelants' final contention is that, even though the charterer had no specific authority to issue bills of lading, since neither the vessel, its master, nor the owner issued such bills, those which it had issued were ratified

when the vessel sailed. This of course was true with reference to such portions of the cargo as were laden on board, because, when ground is broken, "the master must know * * * if he has not himself signed any bills of lading, that the charterer has done so." The Blandon (D. C.) 287 F. 722, 723. But it would be a startling extension of the rule to hold that ratification by sailing extends to unladen cargo.

In The G. A. Tomlinson (D. C.) 293 F. 51, on which libelants rely, the court said: "It may safely be held as a matter of law that [the master] is presumed to have known that the charterer in due course, as agent for the ship, would issue bills of lading for shipments of grain, which, *after it was taken aboard*, became subject to maritime liens." So far the rule goes, and no further. Not only is there no authority in support of the proposition that a vessel's liability for goods of which it has not, and never has had, custody, is affected by the act of sailing, but the reasons for applying this doctrine to goods on board are inapplicable. In the latter case, the shipper is deprived of an opportunity to retake his goods, which are in the sole possession and control of the ship. The Esrom (C. C. A. 2) 272 F. 266, 271. Since bills of lading have been issued, and since it was the master's statutory duty to issue them, those outstanding are held to have been ratified or adopted. But there is no duty, statutory or other, for goods not "delivered to and received by the owner, master, or agent of the vessel" (Comp. Stats. § 8032), and, where the carrier never has assumed custody, all reason for the rule would seem to fail.

With one exception, the cases cited by libelants on other points do not require discussion. In The City of Alexandria (C. C.) 28 F. 202, 206, the ship for a number of years had issued its own bills of lading as soon as merchandise was placed on Mendez & Co.'s lighters, and without waiting for them to reach the ship. The lighter charges were added to the freight bill, and the general understanding was that Mendez & Co. were in the employ of the ship. Libelant's cargo was lost while on a lighter, but the vessel was held responsible notwithstanding.

There, however, the lighterer had been treated by the ship as its agent for many years, and in the very transaction had issued its bills of lading for goods which were lost by it. As the court said: "Mendez & Co. seem to have been understood by the mercantile community at Havana to be the recognized lighterers of the steamship company, and the libelants had uniformly caused their

goods to be delivered to them." In the case at bar, the ship had never in any transaction, at any time, recognized the charterer or the forwarding company as its agent to receive goods, nor had it ever issued bills of lading for goods in the possession of either. There was no holding out of the charterer as agent for the ship, either in prior transactions or at all, whereas, in the case cited, an ostensible agency had existed for a very long time; i. e., "the owners held out Mendez & Co. to the public as intrusted with authority by them to accept the delivery of goods, and receipt for the goods in behalf of the steamships." The City of Alexandria, supra. The two cases therefore are distinguishable, and that referred to is no authority for a recovery here.

It is unnecessary to consider the question of laches, since on the merits respondents must prevail.

Let a decree be entered in their favor, with costs.