**PACIFIC VEGETABLE OIL CORPORATION**

v.

**The M/S NORSE COMMANDER, Her Engines, Tackle, Furniture, Apparel, etc., and Coastal Laboratories, Inc.**

**Adm. No. 2177.**

United States District Court
S. D. Texas,
Houston Division.

Dec. 22, 1966.

George W. Brown, Jr., Beaumont, Tex., for libelant.

William C. Bullard, Houston, Tex., for Coastal Lab., Inc.

Robert C. Davee, Houston, Tex., for M/S Norse Commander.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGLETON, District Judge.

The above entitled and numbered cause, having been tried before the Court without a jury, at the close of the evidence and after hearing arguments of counsel,

this Court adopts the following memorandum of opinion as its findings of fact and conclusions of law.

Plaintiff Pacific Vegetable Oil Corporation (PVO) filed this libel in admiralty in rem against the M/S NORSE COMMANDER and in personam against Coastal Laboratories, Inc. (Coastal). The in rem action against the vessel alleges shortage of and damage to a bulk cargo of bleachable, fancy tallow which PVO asserts was received onboard the vessel in good order and condition for carriage from the port of loading, Marrero, Louisiana, to Rotterdam, Holland; and failure of said vessel to deliver the shipment in like order and condition as when shipped, in that when delivery of the shipment was tendered to the order of libelant at Rotterdam, the cargo was allegedly found to be in a damaged and depreciated condition, and a portion of the cargo was not delivered at all.

PVO also, and alternatively, seeks to recover damages in personam from Coastal, the other defendant, alleging that PVO purchased the shipment in question in reliance on a survey certificate, a certified weight certificate, a suitability certificate, and a report of analysis issued by Coastal; and, that Coastal was negligent in and about its inspection of the cargo and of the vessel's tanks and in issuing certificates and reports that falsely and incorrectly described the quantity, quality, and specifications of the tallow delivered to the vessel.

In early November, 1961, PVO entered into a contract with Delph-Faber Fats & Oils, Inc. for the purchase from Delph-Faber of 300 metric tons (661,380 pounds) of bleachable, fancy tallow at a stated price, the sale to be F. O. B. the NORSE COMMANDER at Marrero, Louisiana. (Coastal's loading survey indicated that 670,159 pounds were loaded.) The tallow was to meet certain specifications and grade requirements, and an independent tester was to certify that the tallow was tested and the requirement satisfied. Delph-Faber employed Coastal to conduct these tests and to submit the reports.

The purchase of the tallow was governed by the rules of the New York Produce Exchange. Rule 5 of these rules sets out the specifications for standard grades of tallows and greases, so that the term "bleachable, fancy tallow" has an immediate, accurate meaning for a person in the tallow and grease industry. Rule 7 provides: "New York Produce Exchange Bureau of Chemistry analysis, or analysis by other recognized independent chemists of samples drawn at port of shipment shall be final in all transactions entered into pursuant to these rules."

The tallow purchased by PVO was transported to Rotterdam in the No. 2 center tank of the NORSE COMMANDER. Part of the cargo (245,000 pounds) was loaded at Avondale, Louisiana, on November 25. The vessel then proceeded to Marrero, Louisiana, where 425,000 pounds of product were loaded out of land tank No. 719. Tank No. 719 at Marrero is some 40 feet high. Product level gauges showed approximately six feet of tallow in the tank prior to loading. After loading, the shore tank was empty. Prior to loading at Avondale, agents of Coastal inspected the vessel and found the No. 2 center tank clean, dry, tight, and suitable for this type of cargo, and the ship's heating coils were also tested and found to be tight.

Coastal used a "Bacon bomb" to gather samples from the No. 2 center tank of the vessel, taking samples at one foot intervals from the bottom of the tank upward. These samples were mixed together. A portion of the mixed sample was given to the vessel's first officer for shipment to Rotterdam. The remainder was retained by Coastal for analysis. Coastal's report of the analysis showed the tallow to be within the grade specifications for "bleachable, fancy tallow." On the basis of this report, a Dutch corporation purchased the shipment from PVO soon after the vessel left Marrero.

The NORSE COMMANDER is owned by Bucha Godager and Co. At all times

pertinent here she was under time charter to Parcel Tankers, Inc. Parcel Tankers in turn had entered into a part-cargo charter party with PVO for transportation of the tallow. A bill of lading on the tallow was issued by agents of Parcel Tankers, Inc. It recites that the cargo was "shipped in apparent good order and condition" and that the quantity, quality, nature and condition of the cargo "is unknown to the vessel and the master."

A preliminary question arose between Bucha Godager and Co. and PVO as to the applicability of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq.

 Owners of the vessel argue that this is not a common carriage situation, but private carriage under a charter party and that therefore COGSA is not applicable. I disagree. PVO did not charter the entire vessel but only a part of it. A ship chartered for a special cargo or to a special person is not a common carrier, but merely an ordinary bailee; but if a part of the vessel is available to the public, although the other portion is taken up by cargo shipped under special charter, the owner is still a common carrier. The Monarch of Nassau, 155 F.2d 48 (5th Cir. 1946); Koppers Connecticut Coke Co. v. James McWilliams, Blue Line, Inc., 89 F.2d 865 (2nd Cir. 1937); 80 C.J.S. Shipping §§ 34, 100–102, pp. 692 to 693, 861 to 863.

 Owners of the vessel also argue that if the subcharterer of the vessel sues the vessel or her owner, but not the charterer, he has no contractual action since the subcharterer is not in privity with the owner; rather he can recover only by proof that negligence of the owner was the proximate cause of damage to the cargo, citing Flat-Top Fuel Co. v. Martin, 85 F.2d 39 (2nd Cir. 1936). The case cited is not in point here for two reasons:

1. The situation in *Flat-Top* was a private carriage situation; and

2. That suit was an in personam action against the owner, while the present suit is in rem against the vessel, to enforce a maritime lien against the ship. Such a lien is created by every valid claim for cargo loss or damage and may arise in cases where the vessel owner is not personally liable. Bulkley v. Naumberg Steam Cotton Co., 24 How. 386, 65 U.S. 386, 16 L.Ed. 599 (1860); United States v. The Brig Malek Adhel, 2 How. 210, 43 U.S. 210, 11 L.Ed. 239 (1844).

The NORSE COMMANDER arrived in Rotterdam on December 15, and began discharging No. 2 center tank on December 17. Whereas the loading at Marrero was done by pumping the tallow directly from the shore tank into the vessel, in Rotterdam the product was lightered ashore. The unloading was done by agents of PVO.

According to the outturn report (prepared by the persons who did the unloading in Rotterdam), tallow was pumped out of the NORSE COMMANDER for some 2½ hours on December 17, until all that remained in the tank was a dark colored bottom layer of some 33½ tons, which was too solidified to be pumped. PVO's agents shut down their pumping operation and decided to apply extra heat to the dark layer in an attempt to loosen it up. The next day, December 18, an additional 21½ tons were pumped into a separate tank on the same lighter which had received the first quantity pumped. The part of the cargo unloaded on December 17 will be referred to as "Portion 1" and that unloaded on December 18 will be referred to as "Portion 2." Portion 1 (about 266 tons) was placed in a land tank. Portion 2 was pumped into a railway tank car. An estimated 12 tons was abandoned onboard ship when it could not be loosened sufficiently for pumping.

Between January 16 and January 18, 1962, the portions in the land tank and in the tank car were delivered to the original consignee, with the exception of a few tons which the receiver refused to accept. Samples of both portions were drawn and sent to a chemist. The chemist's analyses showed that both portions failed to meet grade specifications for bleachable, fancy tallow.

To successfully maintain its action against Coastal, PVO must show, with regard to the tallow, that the tallow was in a damaged or depreciated condition when unloaded at Rotterdam and that this condition had existed at the time the cargo was loaded in Louisiana. As against the NORSE COMMANDER, the proof must be that the tallow was within the grade requirements when loaded in Louisiana, but that it arrived in Rotterdam in a depreciated condition. After carefully considering all of the evidence, this Court is of the opinion that plaintiff has failed to sustain his burden of proof on these issues in each action.

To show damage at Rotterdam, plaintiff relies on:

(1) The outturn report, summarized previously;

(2) The report of P. de Beer & Company, marine surveyors, who boarded the ship December 18. The report is a summary of what the surveyor learned from members of the ship's crew and of his inferences from such statements and personal observation; that when nearing completion of the unloading in No. 2 center tank part of the tallow could not be pumped and was noted to be practically solid and rather discolored; that the No. 2 center tank was the last tank loaded at Marrero, from which the surveyor infers that the tallow in it "came from various shore tanks" and "in all probability included the sweepings from these shore tanks;" and his "further inference that the deviating condition of part of the fancy tallow in Nr. 2 centre cargo tank will in all probability have to be attributed to quite a quantity of dirt and sediment having been loaded in the named cargo tank from the shore tanks at Marrero."

(3) The report of A. Kiewit, another surveyor, who boarded the vessel on December 19. The report is similar to the de Beer report in its summary of what was learned aboard ship, and in its conclusion of pre-loading damage. It was the opinion of this surveyor that upon loading the discolored tallow sank immediately to the bottom of the tank, and it had not been taken into the "Bacon bomb" so that the sample drawn in Marrero could not be considered a representative sample. The Kiewit surveyor stated he was told by the de Beer surveyor that no irregularity existed on the vessel.

(4) Analyses of samples drawn from both Portion 1 and Portion 2 during delivery to the consignee in January. As mentioned previously, these analyses indicated that both portions deviated from normal grade specifications.

On the other hand, defendants have introduced a substantial amount of evidence concerning the technical qualities of tallow and the proper methods for its handling, which, when considered along with other evidence in the case, brings the Court to the conclusion that plaintiff has not carried its burden of proof on the question of damage. The evidence tends to show that:

1. The suction hose on tank 719 at Marrero is at the bottom of the tank near the outer periphery, so that the lower levels of product would be the first loaded into any cargo tank.

2. The color of tallow is not determination of its quality.

3. Solid tallow cannot be pumped; it must be in liquid form to go into the pump.

4. Tallow which can be pumped aboard a ship can be pumped off if proper methods are used.

5. Some rise in percentage of impurities is normal during an ocean voyage (although the claimed rise here exceeds the normal increase for such a voyage).

6. Unloading by lighter as compared with unloading by pipelines will cause a further normal increase in impurities.

7. A hard or semi-hard, dark layer of tallow at the bottom of a tank is expected after an ocean voyage. This layer consists of impurities which, being heavier than the tallow, settle to the bottom, but the layer can be melted and removed by pumping hot tallow back in-

to the tank and then squeegeeing the tank.

8. When the darker layer is removed and then mixed with the rest of the product, the grade specifications of the total mixture should still be acceptable (taking into consideration the normal percentage increase of impurities during the voyage).

As indicated previously, the evidence tending to show that the cargo was damaged on arrival consists of (1) reports of a hard, dark layer which the plaintiff's agents could not unload; and (2) reports of chemical analyses made in January. As to the latter, the Court is unable to accept these reports as indicative of the condition of the cargo when it arrived. The samples analyzed were drawn from the tallow after it had been lightered ashore and a full month after the unloading. In this connection, the Court notes that the outturn report states that samples were drawn from the No. 2 center tank prior to discharge, and, also, that the unloading agents' bill to PVO for expenses incurred includes an item for analysis of the ship's sample drawn from the cargo at the time of loading. It is not known whether the sample drawn in Rotterdam was analyzed, and reports of the analysis of the ship's sample were not introduced into evidence.

As to the evidence of a dark and solidified layer in the No. 2 center tank, the Court cannot, in the light of all the evidence before it, consider this as proof that the tallow was in a damaged condition at the time it arrived in Rotterdam.

The Court is also of the opinion that plaintiff has failed to prove any cargo shortage upon arrival in Rotterdam. The outturn report, based upon the *estimated* quantity of 12 tons abandoned onboard, indicated a shortage of 3.998 metric tons, or 0.61%. Testimony at the trial was that in ocean shipments of tallow and like material, a shortage of .3% to .4% would be normal. This slight difference does not appear to be of any material significance.

Counsel for Coastal Laboratories, Inc. shall prepare and submit to the Court,

after first affording all other parties the opportunity of inspection, an appropriate form of judgment to conform with these findings and conclusions.

The Clerk shall record these findings of fact and conclusions of law and shall send a copy to each counsel named herein.