# HOFFSCHLAEGER COMPANY, LIMITED, v. THE GERMAN BARK PAUL ISENBERG.

## October 7, 1913.

1. *Admiralty—Seaworthiness—Stormy weather—Leaking of ship:* The fact that the hatches and hatch coamings of a ship on the high seas, are injured by the violence of waves sweeping over the deck, and deck seams are sprung from the straining of the hull from gales and accompanying heavy seas of unusual severity, whereby sea water leaks into the hold and injures the cargo, does not necessarily show the vessel was in an unseaworthy condition at the beginning of the voyage.

2. *Same—Stowage of cargo a part of which on being dissolved by sea water, reaches and tends to injure other goods:* Under such circumstances, where the cargo is mainly sulphate of ammonia, which on becoming wet was partially dissolved by the sea water, the fact that

such solution reaches metal goods and bales of school bags made of vegetable fiber, tending to injure the same, does not necessarily show that there was a defective stowage of the cargo.

2. *Same—Stowage of goods liable to be injured by the fumes arising from other goods when wet by sea water:* Under the same circumstances, the fact that fumes arising from the combination of sulphate of ammonia with sea water would have a corrosive action on certain goods stowed near the sulphate of ammonia, would not be evidence of bad stowage where the metal goods were separated from the sulphate of ammonia by a bulkhead and two feet of air space, and the school bags were stowed on the sulphate of ammonia but separated therefrom by proper dunnage.

4. *Same—Damage from fumes arising from portions of the cargo without the presence of sea water—Assumption of risk—Difficulty of apportioning such damage from the actual damage received:* With the same cargo and the probability that the metal goods would be damaged by fumes arising from the sulphate of ammonia without the presence of sea water, and the admission of the owner of the goods from its past experience that such damage would take place to such goods stowed with sulphate of ammonia; *Held*, that the owner had assumed the risk; also that it was impossible to differentiate between the damage that would have been caused without the presence of sea water, and the actual damage received.

5. *Same—Neglect of master on turning aside from his course, to care for goods which had been exposed to injury from sea water and from the corrosive effects of solutions and fumes from other parts of the cargo—Liability of the ship:* A vessel turning aside from its course to a port for survey and repairs, after the cargo had been exposed to such damage, and which remained in such port three and a half months pending repairs, during which time no effort was made by the master to save the goods from further injury and deterioration that would be likely to result from their then condition during the continuation of the voyage, is liable for the damage found to be existing at the end of the voyage, six months later.

*In Admiralty:* Libel *in rem* for damages.

*Holmes, Stanley & Olson,* and *R. W. Breckons* for libelant. *Thompson, Wilder, Watson & Lymer* for libellee.

DoLE, J.   It is established in this case that the libellee,

lying at the port of London, about the 20th day of July 1905, shipped on board merchandise received in good order, well conditioned, and free from damage, to be carried to the port of Honolulu and there delivered to the libelant, the bill of lading therefor making exceptions for all and every damage and accident of the seas and navigation of whatsoever nature and kind,—one exception among others being for any loss or damage caused by the prolongation of the voyage. The libellee arrived in Honolulu May 6, 1906, and delivered to the libelant the said packages of merchandise, which upon delivery were discovered to be damaged, such merchandise consisting of galvanized tubs and buckets packed in nests, and bales of school bags made of some kind of vegetable fiber.

The libelant complained that such damage was due to the unseaworthiness of the libellee, bad stowage, the want of proper dunnage and to the negligence, carelessness, improper conduct and want of attention of the master and crew, and claims damages to the amount of $968.06.

It is alleged by the libellee that the ship was at the beginning of the voyage tight, staunch, strong, seaworthy, and in every way properly fitted, equipped, manned and found in every requisite for the voyage, and that in the stowage of the cargo every precaution was taken for the protection of the same, it being properly dunnaged and matted and after it was taken on board, the hatches were battened down and covered with tarpaulins and properly secured and fastened. The libellee further alleges that after leaving London and reaching the open sea she met incessant stormy weather during September and October, with occasional short periods of fair weather; that such stormy weather was of unusual violence, heavy seas swept the ship and constantly filling the upper deck with sea water caused great injury to the upper works, such as the deck house, the rail and the hatches; that the tarpaulins of the hatches were torn away, the hatch coamings wrenched and bent out of

their proper shape and many of the hatches broken with the violence of the waves and the weight of sea water; that during this stormy weather several of the seams of the deck were sprung and became leaky in consequence thereof, and because thereof and the injury to the hatches and hatch coamings considerable water leaked through and around the hatches into the hold; the rigging was damaged, a large and considerable portion of the sails blown away; that on at least two occasions when the weather was good, the hatches were opened and the cargo examined and found to be damaged by sea water. The evidence shows that the ship was in such a damaged condition from such stormy weather that upon passing the Falkland Islands, it was considered necessary to proceed to Port Stanley, on such islands, for repairs, where she arrived about November 1st. An official survey was at once made and repairs were proceeded with according to the recommendations of such survey. The delay at Port Stanley occupied three and a half months, during which period the cargo was left intact and the hatches, after having been opened and the cargo examined by the board of survey, were shut down and remained so for the rest of the stay.

[1] The burden of proof as to the seaworthiness of the ship and good stowage of the cargo is upon the libellee and I consider from the testimony that it has satisfactorily demonstrated that the ship was in reasonably seaworthy condition at the time the cargo was shipped in London. The testimony of the officers and of the log showed that the stormy weather experienced by the libellee was of unusual violence and that the leakage of sea water into the hold as a result therof was such as would be likely to happen to any sailing ship in good order under the circumstances.

There is one feature of the testimony, however, which might point to some defective construction of the vessel whereby sea water reached the hold in consequence of such construction. I refer to the stanchions of the ship's rail

which were made of iron and were so connected with the
interior of the ship and a runway of cement along.the edge
of the deck as to open a way to the hold upon being bent
and wrenched by the violence of the seas which swept over
the ship.    There is very little evidence on this point except
as to the fact, and it is not easy under the circumstances to
pass upon the question of defective construction, but it
appears to the court that no such intrusion of sea water
into the hold should have been possible from any injury
to the said stanchions.    For want of more definite testi-
mony on this point, however, I will not consider that these
facts point to an unseaworthiness of the ship due to a
defect in its construction.    Moreover it does not appear
that the sea water that reached the hold in this way caused
the damage complained of.

[2] [3] As to the libelant's allegation of defective stow-
age, it appears from the evidence that the cargo in the
main was ammonaic, or sulphate of ammonia, between 1400
and 1600 tons of that material being stowed between decks
and in the lower hold "pretty near" up to the fore hatch;
that the general merchandise including the galvanized ware
and cases of liquor were stowed under and forward of the
fore hatch,—that being the driest part of the ship, and were
separated from the ammoniac by a bulkhead which reached
as high as the goods, and by two feet of open space.    This
does not include the school bags which were placed on the
ammoniac in the same hold and separated therefrom by
dunnage.    There was no shifting of the cargo occasioned
by the stormy weather.    With so large a proportion of am-
moniac in the cargo, it may have been, and probably was,
impracticable to stow it all in the lower hold or all between
decks, both for want of space and for the proper and safe
trimming of the ship.

There is some evidence as to the propriety of stowing
some of the tubs and buckets right side up whereby they
were in a position to catch the sea water that leaked through

the deck and the hatches, and did receive a considerable quantity. The testimony,—what there is of it on this point, supports the practice. Of course the decks are supposed not to leak, and it is obvious that in stowing parcels of an irregular shape such as packages of tubs and buckets would be, in order to have them fit each other firmly so that there would be no movement or sliding with the motions of the vessel, some would be stowed right side up, some bottom side up and some on the side.

I am of the opinion that the libellee has shown the stowage of the cargo to have been reasonably free from defect.

[4] One ground of the claim of the libelant for damages is based on the testimony that there was defective stowage of its goods, in that they were stowed in the same hold with sulphate of ammonia, which exposed them to the corrosive effect of the gases which would arise from the sulphate of ammonia in a close hold even though no water reached them, the point evidently being that even though the greater injury caused by the presence of the sea water should be allowed by the court as an exception due to the perils of the sea, yet there was injury without the presence of the sea water and in spite of it, due to stowage of the goods in the same hold adjacent to the sulphate of ammonia.

Mr. Angus, a witness for libelant, testified as follows: "I have never known a shipment [of buckets and tubs where the sulphate of ammonia has been included as a part of the cargo] to come out in a first class condition. Part of them could probably be passed, but the majority would be touched. On a total shipment I should say it [depreciation] would run from 35 to 60 per cent. others would run more than that." This statement was repeated by Mr. Angus in other words. Mr. Lange, manager of the libelant company, also testified to the same effect, placing the ordinary depreciation of such goods resulting from such shipments at about 40 per cent. From these admissions it is apparent that galvanized goods would be injured where a

part of the cargo is sulphate of ammonia regardless of their position in the ship and that the libelant knew of this probability from its experience. It must be taken therefore to have assumed such risk. Moreover, it is impossible in this case to draw a line between the injury which would have been caused without the presence of sea water and the actual injury which the goods have received.

The sea water which entered the hold wet the sulphate of ammonia, dissolving a portion of it and the solution dripped, or ran, in and over the tubs causing a corrosion of the surface which was the main cause of the injury to them. Mr. Shorey, a chemist who testified in the case, explained how a solution of sulphate of ammonia would destroy such ware, would corrode all metals except gold, silver and platinum, and that the evidence of such corrosion was found extensively on such ware upon its arrival in Honolulu. His testimony as to the injury to the school bags was, that on the outside of the burlap cover of the bales there was a deposit, a sample of which he took, which deposit showed 80 per cent. of sulphate of ammonia; he also examined the inside one of the bales and found on the inner wrapping of the bale 28 per cent. of sulphate of ammonia. The bale from which he took these samples was similar to the other bales as to the appearance of a similar deposit on them. He testified that the effect of the deposit on the school bags would be to alter the structure of the vegetable fiber in the course of time and weaken it. He stated that the effect of dissolving sulphate of ammonia with water would be a solution of sulphate of ammonia containing some free sulphuric acid and the action of the free sulphuric acid on the sea water would generate in small amounts a free hydrochloric acid gas which would have a corrosive action on material subject to corrosion, which might be in close proximity to it; such gas would have more effect upon metals than upon the bags,—would have very little on the latter. He also stated that sulphate of ammonia, independent of the effect which

would result upon being dissolved by sea water, would, in a close hold where the free air is not permitted to circulate, develop smaller amounts of hydrochloric acid gas than in case of being wet with salt water; the result would be of the same nature but different in degree. In his opinion the deposit referred to developed from gas generated either from the sweating of the sulphate of ammonia in the close atmosphere or the sweating accelerated by dampness or water. The 80 per cent. deposit on the bales must have come from the combination of the sulphate of ammonia with water. It is clear from the testimony of the chemist that although in a close hold there might be considerable corrosive gases given off which would be injurious to galvanized ware and to a lesser degree to vegetable fiber, yet the amount of such injury would be less than where such gas was developed by the combination of salt water and sulphate of ammonia.

In the examinations of the cargo which were made on two occasions in good weather before the vessel reached Port Stanley, Jentzen, the second mate, says there were no signs of ammoniac inside the tubs and buckets, the whole deposit being on the outside; the whole top of the bags was wet. He didn't see any white stuff on the bags. Abelt, the first mate, said in reference to the same inspections, "water was in the tubs and pails, wet on top of the cargo, 'tween decks wet, cases was wet and ammoniac was wet too." "We took the water out of them: the tubs were damaged by sea water, and then the ammoniac melted wet by the water coming down and running along the beams."

The report of the surveyors who examined the ship and cargo at Port Stanley has this reference to the injury: "Cargo in the vicinity of main and No. 3 hatch slightly damaged by sea water." No. 3 hatch is testified to be the after hatch. The log under date of November 1st recites: "Surveyors found cargo under and around the hatches damaged by sea water." I find no such entry in the report of the

surveyors. Their report, as above quoted, places the damage to the cargo as in the vicinity of the main and after hatches. The evidence therefore of the injury existing on November 1st, when the vessel reached Port Stanley and the hatches were opened, tends to the belief that the cargo was but slightly injured at that time. The injury as shown by the report of the appraisers in Honolulu is 75 per cent. on the galvanized ware and 80 per cent. on the school bags, and the sale of the goods at auction in Honolulu shows a depreciation of about 58 per cent., or a loss of $750.

[5] It appears from the testimony that the master of the ship made no attempt at Port Stanley to do anything to prevent the cargo in question from further deteriorating through its condition at that time from having been wet with salt water, exposed to the fumes and the drippings of a solution of sulphate of ammonia. There was certainly a great opportunity of making an effort to save these goods from further deterioration in consequence of the condition that they were in at that time. Mr. Shorey testifies that when the bags were opened in Honolulu they were damp and in a heated condition. As regards the tubs and buckets having already been exposed to the action of the solution referred to and to the fumes, does it not seem likely that an examination of their condition, perhaps removing them to the deck and exposing them to the wind and sun, thoroughly drying them out, might not have checked the corrosive action which must have been begun at that time? No such attempt was made, apparently no thought was given to the subject. Now if these goods received their main injury through being left through this period and for the rest of the voyage in statu quo, it was damage not within the exceptions of the third section of the Harter act (27 Stat. 445) or of the exceptions of the bill of lading.

"Losses by perils which have no peculiar connection with the sea, or the navigation, though they may occur during the voyage, do not fall within the exception. For example,

damage . . . by the heating or sweating of the cargo; or by fumes arising from other goods, although the several parts of the cargo may have been well stowed." Carver, Carriage by Sea, 5th ed., sec. 86, p. 117.

"Faults or errors in taking care of the cargo, apart from any working of the vessel are probably excused under section 3rd of the Harter Act." Id., sec. 103 e, p. 152; *Rowson v. Atlantic Transp. Co.*, 9 Asp. M. C. 347.

"I think that the words 'faults or errors in the management of the vessel,' include improper handling of the ship as a ship which affects the safety of the cargo." *The Rodney*, 9 Asp. M. C. 39, cited in *Rowson v. Atlantic Transp. Co.*, supra.

The Rodney case turned on the construction of the Harter act.

It appears to be established that the exceptions of the Harter act would not include a neglect by the master to take care of the cargo by which the cargo is injured while the ship is lying in port, or where such neglect has no connection with the navigation or the management of the ship.

It might be contended that one of the exceptions of the bill of lading would make such injury developing after the arrival of the libellee at Port Stanley a matter of exception. The exception is as follows: "Nor for any loss or damage caused by the prolongation of the voyage." I am of the opinion that that does not affect this case. That refers to a prolongation of the voyage which might be caused by circumstances as have happened to the libellee in which certain goods would have suffered from having been long on board but could hardly include a damage resulting from the negligence of the master in taking care of the goods although the injury arising therefrom might be enhanced by the prolongation of the voyage.

In the case of *Pearce v. The Thomas Newton*, 41 Fed. 106, 108, judgment was rendered against the ship for neglect by the master in doing something or allowing some-

thing to be done for the preservation of the goods after they were injured.

"But no overpowering force prevented them from doing what was necessary for the preservation of the goods after they were injured. Admit that they had no means of drying them. The owner asked for them, and they should have given him an opportunity of doing what they could not, or did not, do themselves. For the damages resulting from the fact that the goods remained uncared for from Monday until Friday . . . . libelant is entitled to a judgment in rem against the steamer."

I do not think the claimant can complain if the libellee is called upon to pay the whole loss to the libelant, for he had it in his power to avoid all liability by doing what could have been done at Port Stanley to save the goods from the deterioration that was very evidently likely to take place from their condition if nothing should be done to avert such deterioration.

There is no evidence definitely showing that the goods were damaged at the time the hold was opened at Port Stanley, November 1st. The survey refers only to the cargo in the vicinity of the main and after hatches, and reports that as "slightly damaged by sea water." The goods under consideration in this action were beyond question in a condition in which they would suffer damage if left in the hold of the ship without some immediate attention. The galvanized ware had some kind of deposit on the outside, probably sulphate of ammonia or zinc salts, or both. The bags were wet. The first knowledge of the officers that some of the seams had sprung and that the vessel was leaking in consequence thereof was on October 18th, fourteen days before the hatches were opened in Port Stanley. On October 19th the uppermost tarpaulins on the hatches were torn by the sea. On October 23rd the log reports tarpaulins of main and after hatches washed away and the hatch coamings bent inwards and several hatches broken. It would appear

from the evidence that the injury to the hatches was confined to the main and after hatches.

It is improbable that the serious injury of the goods which was discovered when they were discharged at Honolulu could have developed during the fourteen days between October 18th and November 1st, when no real damage was discovered by the board of survey. According to Shorey the injury to the bags that would be caused by a deposit of sulphate of ammonia would require a period of time. It is obvious that the damp condition of the bags just before the ship reached Port Stanley, would in the course of time if not remedied create serious injury. The hatches were opened for about an hour at Port Stanley and then closed permanently, so far as the record informs us, leaving the wet bags and the galvanized ware with its deposit of corrosive salts, to swelter for the next six months in the close hold of the ship in company with the ammoniac which had been wet and partially dissolved by salt water

A decree may be entered in favor of the libelant in the sum of seven hundred and fifty dollars ($750.00), being the amount of its loss as shown by the auctioneer's return of the sale of the goods in question at public auction, filed herein, with interest from May 29, 1906, and costs.

These proceedings were begun in this court May 29, 1906, but it was not until October 8, 1912, that the case was finally submitted.