**SAN JUAN TRADING CO., Inc. v. THE MARMEX et al.**
**Admiralty No. 24.**

United States District Court
D. Puerto Rico, San Juan Division.

Sept. 19, 1952.

Luis E. Dubon, San Juan, Puerto Rico, for libelant.

James R. Beverley, San Juan, Puerto Rico, for claimants.

RUIZ-NAZARIO, District Judge.

Libellant herein, San Juan Trading Company, Inc. has filed its libel in rem against the S. S. Marmex, a Mexican merchant vessel, her engines, equipment, apparel, furniture, etc., charging said vessel's failure to make delivery of some 40,132 pieces of .lumber, measuring 326,322 Bmft., or thereabouts, valued at $24,474.15, part of a larger shipment alleged to have been received by it at the port of Tampico, Mexico, for carriage to San Juan, Puerto Rico, and claim-

ing that, by reason thereof, the total amount of $31,341.84, which comprises the aforesaid value of the undelivered lumber, plus freight charges and Mexican tax, is due and owing to the libellant. Libellant bases its claim on:

(a) a certain contract of affreightment entered into between The East Asiatic Co. de Mexico, S. A. and Transpacifica Mexicana S. A. on September 13, 1945, covering a total shipment of not less than 660,000 feet nor more than 750,000 feet of lumber, to be measured, received and delivered at the side of the ship in the Tampico dock, subject to the issuance of a bill of lading covering the total amount of lumber actually shipped; and

(b) a certain bill of lading covering 108,711 pieces of lumber, measuring 660,907 sq. ft. Bmft., issued in the name of Transpacifica Mexicana, S. A. as carrier and alleged owner of the S. S. Marmex, signed in its behalf by G. D. Garza, drawn to the order of the East Asiatic Co. de Mexico, S. A. as shipper and consignee, and to be notified to San Juan Trading Co. Inc., libellant herein. Among the terms and conditions imposed by the carrier in said bill of lading, there is one, in typewriting, appearing on its face and signed in its behalf by G. D. Garza, which reads as follows:

"The merchandise has been counted and measured by the shipper, the vessel accepting it without prejudice of having the same counted and measured at the port of destination."

Printed conditions Nos. 10 and 18, appearing at the reverse thereof, provide:

"10.—The Carrier's responsibility in respect of the Goods as a carrier shall not attach until the Goods are actually loaded for transportation upon the vessel, and shall terminate, without notice, as soon as the Goods leave the Vessel's tackles at destination or other place where the Carrier is authorized to make delivery or end its responsibility. Any responsibility of the Carrier in respect of the Goods attaching prior to such loading or continuing after leaving the Vessel's tackles as aforesaid, whether the Goods are in the course of lighterage by the Carrier or however

else the same may be situated shall be the same as that only of a warehouseman without liability on the part of the Carrier, except for want of ordinary care and all conditions, exemptions, exceptions, and limitations of the liability of the Carrier contained in this contract shall be deemed to apply also to such warehouseman's liability as well as to liability as a Carrier, the Carrier may place the Goods in storage or in piers, lighters, barges or elsewhere, while awaiting loading, transshipment, forwarding or delivery and thereupon be discharged of all responsibility for loss of or damage to the Goods while so stored."

"18.—AND FINALLY in accepting this bill of lading, the shipper, owner and consignee of the Goods and the holder of the Goods and the holder of the bill of lading agree to be bound by all of its stipulations, exceptions and conditions whether written or printed, as fully as if they were all signed by such shipper, owner, consignee or holder, any local customs or privileges to the contrary notwithstanding. No agent or employee of the Carrier shall have authority to waive any provision, exception or condition herein except by an instrument in writing."

Libellant has further alleged "that in execution of the said contract, *delivery* of the aforementioned shipment *was made* to the Master, agents or servants of the said vessel, etc. (Amended Libel Par. 4).

Claimant Crédito Internacional S. A., alleging to be the Trustee and owner of the vessel, has contested the libel, on the following grounds:

(a) That Transpacifica Mexicana S. A. ostensible carrier, both under the contract of affreightment with the shipper, The East Asiatic Co. de Mexico S. A., and under the bill of lading on which libellant bases its claim, was not the owner of the S. S. Marmex, either at the time of the signing of said contracts or at any time thereafter, and that the only agent and operator of said S. S. Marmex, and the only agent of the claimant therefor, was then, and still is, Guillermo Dominguez Bate.

(b) That G. D. Garza, or Guillermina Dominguez Garza, who signed the aforesaid bill of lading, for the carrier, did not then have, nor has ever had, any power or authority to sign any such document in behalf of the carrier or vessel owner, or of the Master or the authorized agent of the said S. S. Marmex; and that the Master, agents or servants of said vessel did never issue or deliver any such bill of lading.

(c) And that whatever validity or binding effect are accorded to said contract of affreightment and bill of lading, the vessel is not liable to libellant for the lumber it claims undelivered, because 40,132 pieces of this, measuring 326,322 Bm'ft., were not actually loaded on board thereof, nor received, accepted and placed under the custody and control of its master or owner for transportation thereon, and 3,085 pieces, thereof, measuring 35,590.87 square feet were lost in transit without the fault, neglect or want of care on the part of the S. S. Marmex, her owner or those in charge of her, but were so lost on account of force majeur, consisting of unusually high seas which washed said pieces of lumber from her decks.

Though the case has been pending for some years, it was not tried until May 24, 1951. At said trial, presided by Judge Roberts, it was stipulated that photostatic copies of some of the exhibits in evidence be submitted in lieu of the originals thereof and that briefs be filed prior to the judge's vacation, so that he could do some research during said period.

However, libellant's brief was not submitted until September 17, 1951, and the claimant's not until September 24, 1951, when Judge Roberts had already resigned.

The parties, then, stipulated to submit the case to the present incumbent, for final determination and decision, on the basis of the record, the exhibits admitted at the pre-trial conference of April 17, 1951, the depositions and exhibits offered and admitted at the May 24, 1951 trial before Judge Roberts, the stenographic transcript of the evidence and proceedings at said trial, certified by the official reporter and dated May 9, 1952, the briefs already submitted by counsel, and a reply brief to be submitted by libellant's counsel, which was finally filed on July 18, 1952.

The court has given due consideration to the pleadings and to the evidence so submitted, as far as these may appear pertinent and material to the determination of the legal questions in controversy, in the light of well established principles of the law and practices in Admiralty hereinafter following.

██ It is well settled that no maritime lien arises for the breach of a contract of affreightment which has never advanced beyond the wholly executory stage. The Freeman v. Buckingham, 18 How. 182, 15 L.Ed. 341; Vandewater v. Mills, 19 How. 82, 15 L.Ed. 554; The Lady Franklin, 8 Wall. 325, 19 L.Ed. 455. And that there is no lien in favor of the holder of a bill issued fraudulently or by mistake, where the goods therein described were not in fact shipped. The Freeman v. Buckingham, supra. In Vandewater v. Mills, supra, the Court held that if the cargo was not placed on board it was not bound to the vessel, and the vessel could not be in default for non-delivery in good order of goods never received, and that consequently, if the master or owner refused to perform the contract, or for any other reason the ship did not receive the cargo and depart on her voyage according to contract, the charterer had no privilege or maritime lien on the ship.

The rule that receipt of the goods lies at the foundation of the contract to carry and deliver also operates a inverso: thus, in The Idaho, 93 U.S. 575, 23 L.Ed. 978, a bill of lading was signed before the goods were delivered to the ship. Later they were delivered to the ship and placed on board. The bill of lading was signed by the lawful master of the ship. It was held, that the bill of lading became operative from the delivery of the goods.

The leading case on this subject is a 1922 case involving the precise situation at bar in this case, that is, whether acceptance of a part of the designated cargo (lumber), under a contract of affreightment, creates a lien upon the ship for refusal to take all. In Osaka Shosen Kaisha v. Pacific Export Lumber Co., 260 U.S. 490, 491, 43 S.Ct. 172, 67 L.Ed. 364, the

captain of the Japanese steamer "Saigon Maru", after having taken a certain amount of lumber on board, refused to take the remainder of the lumber cargo. Both lower courts acted upon the theory that, while the ship is not liable in rem for breach of an affreightment contract so long as it remains wholly executory, she becomes liable therefor whenever she partly executes it, as by taking on board some part of the cargo.

The Supreme Court, reversing the lower courts, The Saigon Maru, D.C., 267 F. 881, Id., 9 Cir., 272 F. 799, reviews all of the cases, beginning with The Schooner Freeman v. Buckingham, cited above, from which it quotes:

"Under the maritime law of the United States the vessel is bound to the cargo, and the cargo to the vessel, for the performance of a contract of affreightment; but the law creates no lien on a vessel as a security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made, and a cargo *shipped* under it." 260 U.S. at page 496, 43 S.Ct. at page 173.

Later, 260 U.S. at page 499, 43 S.Ct. at page 174, the following quotations are made:

" 'The doctrine that the obligation between ship and cargo is mutual and reciprocal, and does not attach until the cargo is on board, or in the custody of the master, has been so often discussed and so long settled, that it would be useless labor to restate it, or the principles which lie at its foundation. The case of the Schooner Freeman v. Buckingham, decided by this court, is decisive of this case.' The Lady Franklin, 8 Wall. 325, 329 [19 L.Ed. 455].

" 'It is a principle of maritime law that the owner of the cargo has a lien on the vessel for any injury he may sustain by the fault of the vessel or the master; but the law creates no lien on a vessel as a security for the performance of a contract to transport a cargo until some lawful contract of affreightment is made, and the cargo to which it relates has been delivered to the custody of the master or some one authorized to receive it.' The Keokuk, 9 Wall. 517, 519 [19 L.Ed. 744]."

After reviewing the above and the Bulkley v. Naumkeag Steam Cotton case, 24 How. 386, 16 L.Ed. 599, which I shall discuss separately, the court 260 U.S. at page 499, 43 S.Ct. at page 174 states:

"The maritime privilege or lien, though adhering to the vessel, is a secret one which may operate to the prejudice of general creditors and purchasers without notice and is therefore *stricti juris* and cannot be extended by construction, analogy or inference. The Yankee Blade [19 How. 82, 15 L.Ed. 554], supra. The contract of affreightment itself creates no lien and this court has consistently declared that the obligation between ship and cargo is mutual and reciprocal and does not attach until the cargo is on board or in the master's custody. We think the lien created by the law must be mutual and reciprocal; the lien of the cargo owner upon the ship is limited by the corresponding and reciprocal rights of the ship owner upon the cargo. See The Thomas P. Sheldon (D.C.) 113 F. 779, 782, 783.

"The theory that partial acceptance of the designated cargo under a contract of affreightment creates a privilege or lien upon the ship for damages resulting from failure to take all, is inconsistent with the opinions of this court and, we think, without support of adequate authority. In the S. L. Watson, 1 Cir., 118 F. 945, 952, the court well said: 'The rule of admiralty, as always stated, is that the cargo is bound to the ship and the ship to the cargo. Whatever cases may have been decided otherwise disregarded the universal fact that no lien arises in admiralty except in connection with some *visible* occurrence relating to the vessel or cargo or to a person injured. This is necessary in order that innocent parties dealing with vessels may not be the losers by secret liens, the existence of

which they have no possibility of detecting by any relation to any *visible* fact. It is in harmony with this rule that no lien lies in behalf of a vessel against her cargo for dead freight, or against a vessel for supplies contracted for, but not actually put aboard. The Kiersage, [14] Fed.Cas. [page 466], No. 7,762, 2 Curt. 421; Pars Ship. & Adm. (1869), 142, 143. It follows out the same principle that Mr. Justice Curtis states in The Kiersage, [14] Fed.Cas. [page 466] No. 7,762, 2 Curt. 424, that admiralty liens are *stricti juris,* and that they cannot be extended argumentatively, or by analogy, or by inference. He says: "They must be given by the law itself, and the case must be found described in the law." ' "

Libellant quotes from The Delaware, 14 Wall. 579, 81 U.S. 579, 20 L.Ed. 779, to show that bills of lading operate as between the owner or charterer and the shipper by way of relation and estoppel. But this case in no wise modifies or dilutes in any way the effect of the cases reviewed above, as, in The Delaware the goods were *actually* placed aboard the vessel, from which they were later jettisoned because of a peril of the sea. Indeed, the court says, 14 Wall. at page 602: "Bills of lading when signed by the master, duly executed in the usual course of business, bind the owners of the vessel if the goods were *laden on board* or were *actually* delivered into the custody of the master, but it is well settled law that the owners are not liable, if the party to whom the bill of lading was given had no goods, or the goods described in the bill of lading were never put on board or delivered into the custody of the carrier or his agent."

In Bulkley v. Naumkeag Steam Cotton Company, 24 How. 386, 65 U.S. 386, 16 L.Ed. 599, the barque Edwin received the principal part of her cargo at the city of Mobile. Due to the peculiar conditions at Mobile, after the Edwin had received part of her cargo she was towed down below the bar to receive the residue. The master of the Edwin employed the steam lighter M. Streck for this purpose, and 100 bales of cotton were taken aboard the M. Streck at the city to be taken down to the Edwin. On the way down, the boiler of the lighter exploded, the 100 bales were thrown into the water and the lighter sunk.

The court held that delivery to the lighterman was delivery to the master, and that transportation by the lighter to the master was commencement of the voyage, in execution of the contract to carry the cotton to Boston.

In The Capitaine Faure, 2 Cir., 10 F.2d 950, 951, the court held that although a master has no power to bind shipowners by false bill of lading, bills of lading falsely showing goods are aboard ship bind the ship where goods are *actually received* on board and not transported to destination.

In Olivier Straw Goods Corporation v. Osaka Shosen Kaisha, 2 Cir., 27 F.2d 129, also cited by libellant, the goods were *delivered to the shipowner* who stored the goods in a customs compound. The next day the respondent shipowner issued and delivered its bill of lading while the vessel that was to carry the goods, the Alaska Maru, was at Kobe, 354 miles from Yokohama, where the goods were stored. Before the goods were loaded, and while in the shed, the 1923 Japanese earthquake occurred, and the shed was looted in the ensuing confusion.

The libellant, as indorsee of the bill of lading and owner of the merchandise, filed its libel against the *steamship company* for breach of the promise in the bill of lading to deliver the merchandise.

The court held the respondent liable, holding that a carrier who has given a *clean bill of lading*, stating that goods have been received in good order, is estopped to deny the assertion against a purchaser of the bill of lading who has been misled by the representation and has altered his position to his detriment on the faith of the representation.

However, this case is hardly applicable to the case at bar as there was an *actual delivery* to the steamship company, and the goods were in its custody at the time of the earthquake.

General Foods Corporation v. The Felipe Camarao, 2 Cir., 172 F.2d 131, was a case where libellant, General Foods Corporation, contracted to purchase 10,000 bags of Brazil nuts from Companhia Industrial do Brazil and procured an irrevocable letter of credit in favor of the seller providing that a sight draft for the price of the nuts would be honored if accompanied by an on board ocean bill of lading showing shipment of the nuts before July 1, 1942. The seller actually *delivered* 10,000 bags of nuts to Lloyd Brasileiro (the owner of the Camarao) and received in exchange a *clean on board* bill of lading which recited they had been "received on board" the S.S. Felipe Camarao. The nuts were short shipped. The court held that the carrier was estopped to deny that the goods were laden. The court decided this question on the doctrine of the Olivier case, which I have distinguished above.

The S.S. Manuel Arnús, D.C., 23 F.Supp. 770, also cited by libellant, only applies here with respect to claimant's defense that the bill of lading was not signed by any authorized agent of the carrier, who, thus, was not liable thereunder either to libellant or to any other party, in view of the evidence showing that the Marmex was laden with certain hemp consigned to Recondo and Camacho, covered by another bill of lading also signed by the same G. D. Garza, who claimant charges had no authority therefor whatsoever, so far as The S.S. Manuel Arnús holds that where it was conceded that 27 other bills of lading were signed in behalf of the shipowner by the same person who had signed the *clean* bill of lading purchased, in due course, by the there libellant, the shipowner or carrier was estopped to deny said agent's authority to sign the bill of lading on behalf of the carrier.

Said case, however, has no bearing whatsoever in the essential issue here, because all that it holds, in said connection, is that the vessel was liable to the there libellant, under the *rebuttable presumption* arising from the statement or admission to the effect that the goods were received aboard the vessel, contained in the *clean* bill of lading purchased, in due course, by said libellant, because respondent, there, "introduced no evidence to overcome" said presumption.

Here, the bill of lading on which libellant relies, is not a "clean" bill of lading. The carrier, in the typewritten condition appearing on its face and quoted supra, specifically warned any holder thereof that the merchandise had been counted and measured by the *shipper* and that the vessel would not be prejudiced or bound thereby, but had accepted it subject to have the same counted and measured at the port of destination. Therefore, even if it were conceded that the bill of lading had been issued by the shipowner, or its authorized agent or representative, or that it was ratified by the vessel's master when he signed the November 1945 stipulation with libellant or when he executed the release order at the reverse of said bill of lading, as claimed in libellant's reply brief, the fact remains that it never was, and cannot be claimed to be a "clean" bill of lading. Furthermore, under printed condition No. 10 of said bill of lading, also quoted supra, the carrier's liability in respect of the goods was not to attach until these were *actually* loaded for transportation upon the vessel, and under its printed condition No. 18, quoted supra, the shipper, owner, consignee and holder of the goods, as well as the *holder of the bill of lading,* are bound by all the stipulations, exceptions, conditions, etc., thereof, as fully as if they were all signed by them.

In addition, whatever rebuttable presumption might have arisen, under said bill of lading, as to the receipt of the lumber on board the Marmex, it has been fully overcome by the undisputed evidence, here, with respect to the 40,132 pieces, measuring 326,322 Bmft. which, as claimant alleges in its answer, were never *actually* loaded on board said vessel, and as to which, under the above cited principles of the law and practices in admiralty, no liability in rem against said vessel has ever attached.

It follows, therefore, that the present libel must be dismissed as to said 40,132 pieces of lumber, measuring 326,322 Bmft. not actually loaded on board the S.S.

Marmex, nor placed under the custody of its master, owner or authorized agent and which the evidence undisputedly shows remained under the custody and possession of the shipper.

■■ It, however, appears upon claimant's own admission (answer to amended libel Par. 7) that, out of the alleged total shipment of lumber, 71,664 pieces, measuring 506,665 square feet, were actually received from the shipper, and placed on board S.S. Marmex for transportation to the port of San Juan, Puerto Rico, on said voyage. As to these, actually shipped, pieces of lumber, the liability of the vessel and the lien thereon are unquestionable, the validity or invalidity of the bill of lading, or its very existence, notwithstanding. Under the above discussed principle, the lien on and liability of the vessel, for the safe delivery of the aforesaid 71,664 pieces of lumber, attached, merely, by their being laden aboard thereof and did not terminate until said pieces were totally delivered to the consignee at the port of destination.

The evidence shows, without contradiction, and upon claimant's own admission (same Par. of Answer), that only 68,579 pieces, measuring 471,074.13 square feet were delivered to libellant, as lawful owner of said shipment, and that the vessel failed to deliver 3,085 pieces, measuring 35,590.87 square feet, which claimant alleges were lost in transit without the fault, neglect or want of care on the part of the S.S, Marmex, her owner or those in charge of her, and due to force majeur consisting of unusual high seas which washed said pieces of lumber from her decks. Claimant has failed to prove that said pieces of lumber were lost on this account or due to any act not under the control of the vessel's master.

Libellant is, therefore, entitled to recover against the vessel the value of said 3,085 pieces of lumber, measuring 35,590.87, plus the freight charges and Mexican tax thereon.

■ As to interest, it appears to be the rule, that the awarding thereof is a matter of the Court's discretion, but that this is a legal discretion, and the award is to be made whenever damages lawfully due are withheld, unless there are exceptional circumstances to justify the refusal. The Wright, 2 Cir., 109 F.2d 699, 702.

■■ Although, as said case holds, long delay in pressing the libel is recognized as such exceptional circumstances to justify refusal of interest, there is no justification for holding that libellant must be blamed for the delay, here. The taking of depositions at the request of both parties and two successive vacancies in this bench substantially explain the delay and cannot be said to constitute exceptional circumstances justifying a refusal to award interest, considering that claimant has been, in the meantime, withholding the damages lawfully due to libellant.

Interest at the legal rate of 6% per annum from November 7, 1945 must be awarded on the principal amount found to be due and owing to libellant.

■ Libellant also asks for costs. The granting or apportionment of these rests within the sound judicial discretion of the court. In exercising this discretion the court must determine which party's imprudence is mainly responsible for the litigation. Though libellant lawfully had a right to proceed in rem against the S.S. Marmex, said vessel's liability thereon, as above found, was in a much lesser degree than that claimed in the libel herein. Thus, libellant's exaggerated claim against the vessel justified claimant's contest thereof. Though claimant denied all liability of the vessel, whatsoever, its contest of that portion of the libel on which the vessel has been found liable cannot be treated as ab initio baseless. It would sound oppressive, in the above circumstances, to allow costs to libellant. A better use of the court's discretion commands that no award for costs be made to either of the parties and that each support its own.

Before closing this opinion, the court must make clear that such rights as libellant may have, to bring whatever personal action against any party whatsoever, for the recovery of damages found not recoverable hereunder, shall be deemed unaffected by the decree to be entered herein.

Findings of fact and conclusions of law will be made and a decree entered in accordance with this opinion.

### Decree

An opinion, findings of fact and conclusions of law having this day been duly entered in this cause, it is

Ordered, Adjudged and Decreed, that the libellant, San Juan Trading Company, Inc., have, receive and recover of and from the S.S. Marmex, her claimant and stipulators, damages amounting to $3,796.78, plus interest thereon, at the legal rate of 6% per annum, from and after November 7, 1945, until said sum shall be fully paid.

No special taxation of costs is made.

And it is further Ordered that unless this decree be satisfied, or proceedings thereon stayed by an appeal within ten days after service of a copy of this decree with notice of entry on claimant's proctors, the libellant have execution against the claimant and its stipulators for value, their goods, chattels, and lands, forthwith to satisfy this decree.