452 F.2d 810
 HELLENIC LINES, LTD., as Owner of S.S. HELLENIC TORCH, S.S.
HELLENIC STAR, S.S. HELLENIC SAILOR, S.S. HELLENIC
GLORY, and S.S. HELLENIC WAVE, Appellant,
v.
DIRECTOR GENERAL OF the INDIA SUPPLY MISSION for and on
Behalf of the UNION OF INDIA, Appellee.
 No. 210, Docket 71-1355.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 28, 1971.
Decided Dec. 28, 1971.
 
 Robert E. Meshel, New York City (Baker, Nelson, Williams & Mitchell, New York City, on the brief), for appellee.
 Edward L. Smith, New York City (William J. Crabtree, Kirlin, Campbell & Keating, New York City, on the brief), for appellant.
 Before LUMBARD, HAYS and OAKES, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 This appeal is from a judgment entered in the United States District Court for the Southern District of New York, D.C., 319 F.Supp. 821, dismissing three admiralty and maritime complaints in which plaintiff-appellant sought damages for breaches of contracts of affreightment. The three actions, consolidated for trial, sought detention damages and reimbursement for lighterage expenses in connection with various cargo shipments to the ports of Bombay and Calcutta. We affirm the dismissal of the complaints in all three actions.
 
 I. Facts
 
 2
 Appellant shipowner entered into a series of freight contracts to carry appellee's cargoes, consisting of fertilizers and rice, from United States ports to Bombay. The three affreightment contracts involved herein contain identical terms, and were negotiated and executed in the United States. The terms of the contracts relevant to these three suits provide:
 
 
 3
 1. This shipment is to be on full berth terms at both loading and discharging ports except in those specific respects provided hereinafter.
 
 
 4
 ******
 
 
 5
 * * *
 
 
 6
 3. All discharge expenses are for the account of the vessel. Consignee will supply the vessel, at its expense, bags and twine, etc. All expenses relative to bagging, twining, stitching will be for account of receivers.
 
 
 7
 ******
 
 
 8
 * * *
 
 
 9
 10. No demurrage or despatch is applicable at either loading or discharging ports.
 
 
 10
 ******
 
 
 11
 * * *
 
 
 12
 15. In the event of a strike at the discharging port, the owners of the cargo have the option of designating an alternative port of discharge on the same coast. . . . In the event all ports on the same coast are strikebound, the owners of the cargo have the option of designating another port of discharge not on the same coast. . . . The owners of the cargo may exercise this option at any time before the vessel arrives at the port limits but in the event the vessel has arrived at the port limits the carrier may remain at the port or request the consignee or [sic] designate an alternative port. If the carrier should request an alternative port the consignee must designate the port in writing within 72 hours after receipt of the request. If the alternative discharge port is not nominated in writing within 72 hours after receipt of the request the master may act in accordance with such terms and such conditions of the corresponding bill of lading as may be applicable in the circumstances. . . .
 
 
 13
 16. The Port Trust Authorities at the discharge port shall be the authority to determine as to whether a strike exists for the purpose of this contract.
 
 
 14
 17. Carrier's regular form of bill of lading is to be used under this contract and bill of lading shall also containing [sic] the following clause "all conditions and exceptions contained in the contract of affreightment . . . [dated] are to be considered as embodied in Carrier's bill of lading, and in case of inconsistency between any terms of this contract and any terms of said bill of lading the contract shall control."
 
 
 15
 The bills of lading issued by plaintiff contained clauses relating to the discharge of cargo providing:
 
 
 16
 12. The port authorities are hereby authorized to grant a general order for discharging immediately on arrival of the ship and the carrier without giving notice either of arrival or discharge, may discharge the goods directly they come to hand at or upon any wharf, craft or place that the carrier may select and continuously, Sundays and holidays included, at all such hours by day or by night as the carrier may determine, no matter what the state of the weather or custom of the port may be, and the goods shall be received, package by package as discharged from the ship's tackle, if desired by the carrier. . . . All lighterage and use of craft in loading or discharging shall be at the risk and expense of the goods and shall be provided by shipper, consignee, receiver and/or owner of the goods. . . . If the vessel's loading or discharge is delayed through failure of shipper, consignee, receiver and/or owner of the goods to supply cargo, to furnish lighterage or use of craft or to deliver, receive or remove the goods or supply sufficient labor when the goods are to be loaded or discharged, free of expense to the vessel so that the vessel may load and discharge as fast as she can, in any state of weather, continuously day and night, 24 hours per day, Sundays and holidays included, notwithstanding custom or tradition of port, the shipper, consignee, receiver and/or owner of the goods will pay for the detention of the vessel at the daily current rate of the vessel's charter hire if the vessel is on time charter to the carrier, plus 25% to cover carrier's overhead expenses and fuel and, if owned by the carrier, at the daily market value for the use of similar vessel plus 25% to cover carrier's overhead expenses and fuel.
 
 
 17
 In addition, each bill of lading provided with respect to strikes at the ports of discharge:
 
 
 18
 24. If, at any port discharge cannot be commenced immediately on arrival and/or continued normally owing to interdict congestion, closure of the port, lack of lighters, bad weather, strikes, labor disputes or any other causes beyond the control of steamer or owners, the vessel is at liberty to discharge at any other safe and convenient port at Master's option. Such discharge at another port shall be considered as final delivery and full freight and charges shall become due.
 
 
 19
 One of the bills of lading, that issued for the cargo loaded on board the S.S. Hellenic Star, contained the following additional typewritten clause, the significance of which will be discussed below:
 
 
 20
 Consignees to arrange to receive cargo on arrival at or off Bombay, failing which to pay detention according to clause 12.
 
 
 21
 The first transaction that is the subject of dispute involved a contract, entered into in December, 1963, for the transport of 4929.3 metric tons of fertilizer from Galveston to Bombay. The cargo was loaded aboard the S.S. Hellenic Torch, a general liner ship, on January 19, 1964. The Torch arrived at Bombay on April 16, 1964, and appellant's agents, Shaw Wallace & Co., requested the Bombay Port Trust to allot the Torch a shoreside berth at which to unload the fertilizer. The Trust operates the Bombay port facilities and harbor, and is an autonomous administrative unit not under appellee's control. From April 14 to May 6 the shore laborers in Bombay conducted a work slowdown (referred to as "a go-slow"). The port was congested with ships waiting to discharge cargoes, and the Trust refused at that time to allocate shoreside berths for the discharge of fertilizer in bulk. The Torch was therefore forced to anchor in the harbor, although it was permitted to berth briefly at a dock to unload some of its other cargo. After the Torch's arrival, Shaw notified the consignee, the Regional Director (Food), that the Torch was prepared to discharge the fertilizer from its anchorage. The consignee maintained that, under the terms of the contract, the cargo had to be discharged at a shoreside berth. Shaw requested that the consignee provide lighters to unload the cargo from the Torch's anchorage, and, later, that the consignee nominate another port to which the Torch could proceed to discharge the cargo. The consignee refused both requests, and Shaw notified the appellee that it considered the contract to have been breached and that the Torch would remain in Bombay and charge appellee for detention damages. On May 27, 29, and 30, some fertilizer was discharged from the Torch into lighters. The Trust finally allotted the Torch a shoreside berth to discharge the remaining fertilizer on June 1, and the cargo was completely unloaded and cleared by June 7. Appellant claims alternatively 1) detention damages under clause 12 of the bill of lading of approximately $84,000 due to consignee's failure to receive the cargo into lighters after the Torch's arrival at anchorage; 2) detention damages of approximately $73,000 for appellee's failure to designate an alternative port at which the cargo could have been discharged; or 3) damages of approximately $8,000 for appellee's failure to take delivery of 750 tons of fertilizer per day after discharging into lighters had commenced on May 27.
 
 
 22
 The second episode involved a similar shipment of fertilizer from Houston to Bombay. The affreightment contract was dated March 10, 1964 and the cargo loaded on board the S.S. Hellenic Star, also a general liner, on April 15, 1964. The district court found as a matter of fact that the bill of lading, as issued on April 15, did not contain the typewritten clause, quoted above, that the consignee was to pay damages if it failed to receive the cargo "at or off Bombay." The clause was added to the bill of lading at some time subsequent to the Star's departure from Houston and prior to its arrival in Bombay on June 24. The port was still congested, and the Trust refused Shaw's request to allot the Star a shoreside berth. Shaw's request that appellee provide lighters for unloading at anchorage was also refused. The Star was allotted a shoreside berth on July 3 to unload general cargo but not to unload bulk fertilizer. The appellant and appellee then agreed that the Star could deliver the fertilizer to Calcutta, one of its next scheduled ports of call, providing, however, that the discharge "at Calcutta [will be] only on the basis of no extra costs" to appellee. The appellant reserved the right "to claim compensation for the detentions at Bombay and also for any detentions which might occur at Calcutta." The Star departed Bombay on July 4 and arrived at Sandheads, a deep water anchorage 120 nautical miles outside Calcutta, on August 13. The Dock Managers of the Calcutta Port Trust, also an autonomous body, are responsible for allocating berths at the port of Calcutta. The allocations are made on the basis of the priority of arrival at Sandheads and such factors as the nature of the cargo. The Calcutta Port Trust allotted the Star a shoreside berth on August 18. The fertilizer was discharged during the period from August 24 to August 29. Appellant contends, as in the case of the Torch, that the terms of the contract and the bill of lading required the appellee to furnish lighters to unload the Star's cargo while the Star was at anchorage at Bombay and Sandheads, and that appellant is liable for detention damages totaling approximately $22,000 for the "detention" of the Star in both ports. Appellant further contends that, even if detention damages are not recoverable under the provisions of the contract, they are recoverable pursuant to the typewritten clause on the bill of lading which, appellant argues, required appellee to take delivery of the fertilizer as soon as the Star reached Bombay or else to pay detention damages according to the formula set forth in clause 12 of the bill of lading.
 
 
 23
 The third episode concerns a series of deliveries of rice and fertilizer from various United States ports to Bombay. Three of appellant's ships-the S.S. Hellenic Wave, S.S. Hellenic Glory, and S.S. Hellenic Sailor-delivered the cargoes to Bombay pursuant to freight contracts dated November 19, 1963, December 11, 1963, and October 1, 1963. While these ships were at anchor in Bombay harbor, Shaw arranged and paid for lighters to unload the cargoes. Appellant contends that, as appellee was obligated under clause 12 of the bills of lading to pay for all lighterage expenses incurred in discharging the cargoes, appellant is entitled to recover the approximately $20,000 lighterage costs that Shaw paid and for which Shaw was reimbursed by appellant.
 
 II. The Claims for Detention Damages
 
 24
 Appellant contends that when the Torch and the Star arrived at anchor in Bombay, the anchorage was a "berth" within the meaning of clauses 1 and 3 of the contract, and clause 3 required the consignee to take delivery of the cargo by supplying lighters to discharge the cargoes. The same contention is made with respect to the Star's anchorage at Sandheads off Calcutta. Following this reasoning, appellant asserts that appellee is liable under clause 12 of the bill of lading for detention damages for failing "to furnish lighterage." We disagree.
 
 
 25
 The contract specifically provided in clause 17 that the bill of lading shall incorporate all the "conditions and exceptions contained in [the] contract of affreightment" and that "in case of inconsistency between any terms of this contract and any terms of said bill of lading the contract shall control." Thus, the terms "berth" and "full berth terms," as used in the contract, would control over any language in the bill of lading indicating that the appellee was responsible for providing lighters. See Poor, American Law of Charter Parties and Ocean Bills of Lading 134-35 (5th Ed. 1968).
 
 
 26
 The district court found as a matter of fact that the terms "berth" and "full berth terms" as used in the contract meant "shoreside dock, pier or quay," not an anchorage. A witness who had participated in the negotiations testified that the appellant undertook "the risks of waiting for the rotation in turn . . . in accordance with the [Bombay] customs . . . ." The record contains uncontradicted evidence that the custom of the port of Bombay was that fertilizer was discharged at shoreside berths. Given the evidence in the record both as to the intent of the parties and the custom of the port of Bombay, Continental Coal Co. v. Birdsall, 108 F. 882 (4th Cir. 1901); 5 Williston, Law of Contracts Sec. 653 (3d ed. by Jaeger 1961), the district court's finding that "berth" and "berth terms" meant a shoreside berth is not clearly erroneous. Therefore, under the terms of the contract appellant was responsible for all expenses until the cargo was discharged at a dock or pier, and until such time appellee was not obligated to receive the cargoes.
 
 
 27
 Because appellee was under no contractual obligation to receive the cargoes except at a shoreside berth, appellant cannot claim reimbursement under clause 12 of the bill of lading for the expenses incurred in hiring lighters to unload the Wave, Glory, and Sailor. Insofar as clause 12 provides that appellee is responsible for the expense of lighters, it is inconsistent with the controlling contract and is therefore of no legal effect.
 
 
 28
 The district court found as a matter of fact that appellant added the typewritten clause to the Star's bill of lading after copies of the bill had been released but before the original was exchanged for the mate's receipt. The district court found that the addendum had been typed after the Torch arrived in Bombay and after appellant was aware of the port congestion there. The Star had sailed by that time. Appellant contends that because the consignee used the amended bill of lading to obtain delivery of the fertilizer the consignee and appellee impliedly assented to the added provision.
 
 
 29
 Appellant has not cited nor can we find any case holding that a carrier can unilaterally add a clause such as was added here to a bill of lading after the carrier had issued a memorandum bill of lading not containing such a clause and after the ship has sailed, and, by that action, force the shipper or consignee either to accept the added term or to sue for conversion. Whatever may be the rule with respect to clauses added, before sailing, dealing with the amount or quality of the cargo, San Juan Trading Co. v. The Marmex, 107 F.Supp. 253 (D.P.R.1952), aff'd, 212 F.2d 206 (1st Cir.), cert. denied, 348 U.S. 822, 75 S.Ct. 36, 99 L.Ed. 648 (1954), it is irrelevant to this case. The Star had already sailed by the time the appellee received notice of the added term. The appellee had no choice but to forward the bill of lading to the consignee, who had no choice but to use the bill of lading to obtain the cargo. To accept the underlying proposition of appellant's argument would allow a carrier to change unilaterally almost any previously agreed upon term or to add conditions which a cargo owner and a consignee would be forced to accept because the ship was already on the high seas. We hold, therefore, that the added provision of the bill of lading was not binding on the appellee or the consignee, and that appellant cannot claim detention damages based on that clause.
 
 
 30
 The district court held in the alternative that even if the appellant's addition of the typewritten clause could permissibly alter the obligations of the parties, the added clause would be inconsistent with the controlling contract which obligated appellant to discharge the fertilizer at a shoreside berth. We also agree with this alternative holding.
 
 
 31
 III. The Claim for Detention Damages for Appellee's Failure
 
 
 32
 to Designate an Alternative Port
 
 
 33
 The district court, assuming without deciding that there was a strike at the Port of Bombay within the meaning of clause 15 of the contract, held that appellee's failure to designate an alternative port within 72 hours after appellant's request did not obligate the master of the Torch to remain in Bombay, and therefore detention damages could not be claimed. We will assume as did the district court that a strike existed at the port even though no official of the Trust had declared that there was a strike as clause 16 of the contract might be read to require. Under clause 24 of the bill of lading, the master of the Torch had, after appellee's failure to nominate another port, the option of proceeding to any safe port to discharge the fertilizer. The master elected to remain in Bombay, and under the explicit provisions of clause 3 was responsible for all risks and expenses until the cargo was discharged at a shoreside berth. Since the master of the Torch chose to remain in Bombay, the appellant cannot claim detention damages based on appellee's failure to designate.
 
 
 34
 As the decision of the district court is affirmed, we feel no need to pass on the district court's ruling that clause 10 of the freight contract, which provided that "no demurrage or despatch is applicable at either loading or discharging ports," precludes appellant in any event from claiming detention damages for the various delays experienced in these transactions.